## WILDENHUS'S CASE.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR
THE DISTRICT OF NEW JERSEY.

Argued December 7, 1886. — Decided January 10, 1887.[1]

A Circuit Court of the United States has jurisdiction to issue a writ of *habeas corpus* to determine whether one of the crew of a foreign vessel in a port of the United States, who is in the custody of the state authorities, charged with the commission of a crime, within the port, against the laws of the state, is exempt from local jurisdiction under the provisions of a treaty between the United States and the foreign nation to which the vessel belongs.

Unless exempted by treaty, a foreign merchant vessel, entering a port of the United States for purposes of trade, is subject to the local law, and the local courts may punish for crimes committed upon the vessel, within the port, by one foreigner upon another foreigner.

Article XI of the Convention between Belgium and the United States of March 9, 1880, 21·Stat. 781, conferring power upon Belgian consuls in the United States to take cognizance of differences between captains, officers, and crews of Belgian merchant vessels which are in ports of the United States, and providing that the local authorities shall not interfere except when a disorder arises of such a nature as to disturb tranquillity or public order on shore or in the port, does not apply to a case of

---

[1] The docket title of this case was "No. 1288. Charles Mali, Consul of His Majesty the King of the Belgians, and Joseph Wildenhus, Gionviennie Gobnbosich, and John J. Ostenmeyer, Appellants, *v.* The Keeper of the Common Jail of Hudson County, New Jersey."

felonious homicide committed on board of a Belgian merchant vessel in a port of the United States, and does not deprive the local authorities of the port of jurisdiction over such a crime so committed by one Belgian upon the person of another Belgian, both belonging to the crew of the vessel.

THIS appeal brought up an application made to the Circuit Court of the United States for the District of New Jersey, by Charles Mali, the " Consul of His Majesty the King of the Belgians, for the States of New York and New Jersey, in the United States," for himself as such consul, "and in behalf of one Joseph Wildenhus, one Gionviennie Gobnbosich, and one John J. Ostenmeyer," for the release, upon a writ of *habeas corpus*, of Wildenhus, Gobnbosich, and Ostenmeyer from the custody of the keeper of the common jail of Hudson County, New Jersey, and their delivery to the consul, "to be dealt with according to the law of Belgium." The facts on which the application rested were thus stated in the petition for the writ:

"*Second.* That on or about the sixth day of October, 1886, on board the Belgian steamship Noordland, there occurred an affray between the said Joseph Wildenhus and one Fijens, wherein and whereby it is charged that the said Wildenhus stabbed with a knife and inflicted upon the said Fijens a mortal wound, of which he afterwards died.

" *Third.* That the said Wildenhus is a subject of the Kingdom of Belgium and has his domicil therein, and is one of the crew of the said steamship Noordland, and was such when the said affray occurred.

"*Fourth.* That the said Fijens was also a subject of Belgium and had his domicil and residence therein, and at the time of the said affray, as well as at the time of his subsequent death, was one of the crew of the said steamship.

" *Fifth.* That at the time said affray occurred the said steamship Noordland was lying moored at the dock of the port of Jersey City, in said state of New Jersey.

" *Sixth.* That the said affray occurred and ended wholly below the deck of the said steamship, and that the tranquillity of the said port of Jersey City was in nowise disturbed or endangered thereby.

Statement·of, Facts.

" *Seventh.* That said affray occurred in the presence of several witnesses all of .whom were and still are of ·the crew of· the said vessel, and that no· other person or persons except those of ·the crew of said vessel were present or near by.

" *Eighth.* Your petitioner therefore respectfully shows unto this honorable court that the said affray occurred outside of the jurisdiction of the said state of New Jersey.

" *Ninth.* But, notwithstanding the foregoing facts, your petitioner respectfully further shows that the police authorities of Jersey City, in said state of New Jersey, have arrested the said Joseph Wildenhus, and also the said Gionviennie Gobnbosich and John J. Ostenmeyer, of the crew of the said vessel (one of whom is a quartermaster thereof), and that said Joseph Wildenhus has been committed by a police magistrate, acting under the authority of the said state, to the common jail of the county of Hudson, on a charge of an indictable offence under the laws of the said state of New Jersey, and is now held in confinement by the keeper of the said jail, and that the others of the said crew arrested as aforesaid are also detained in custody and confinement as witnesses to testify in such proceedings as may hereafter be had against the said Wildenhus."

ARTICLES 8, 9, and 10 of a royal decree of the King of the Belgians, made on· the 11th of March, 1857, relating to consuls and consular jurisdiction, were as follows: [1]

---

[1] ART. 8. Nos consuls ont le droit de discipline sur les navires de commerce belges dans tous les ports et rades de leur arrondissement.

En matière de délits ou de crimes, ils font les actes d'instruction, conformément aux prescriptions du Code disciplinaire et pénal de la marine marchande.

Ils réclament, aux termes des conventions ou des lois en vigueur, le concours des autorités locales pour l'arrestation et la remise à bord des marins déserteurs.

ART. 9. Hors le cas où la tranquillité du port aurait été compromise par l'événement, le consul réclamera contre toute tentative que ferait l'autorité locale, de connaître des crimes ou délits commis, à bord d'un navire belge, par un homme de l'équipage envers un homme soit du même équipage, soit de l'équipage d'un autre navire belge.

Il fera les démarches convenables pour obtenir que la connaissance de l'affaire lui soit remise afin qu'elle soit ultérieurement jugée d'après les lois belges.

"ART. 8. Our consuls have the right of discipline on Belgian merchant vessels in all the ports and harbors of their district.

"In matters of offences or crimes they are to make the examination conformably to the instructions of the disciplinary and penal code of the merchant service.

"They are to claim, according to the terms of the conventions and laws in force, the assistance of the local authorities for the arrest and taking on board of deserting seamen.

"ART. 9. Except in the case where the peace of the port shall have been compromised by the occurrence, the consul shall protest against every attempt that the local authority may make to take cognizance of crimes or offences committed on board of a Belgian vessel by one of the ship's company towards one, either of the same company, or of the company of another Belgian vessel.

"He shall take the proper steps to have the cognizance of the case turned over to him, in order that it be ultimately tried according to Belgian laws.

"ART. 10. When men belonging to the company of a Belgian vessel shall be guilty of offences or crimes out of the ship, or even on board the ship, but against persons not of the company, the consul shall, if the local authority arrests or prosecutes them, take the necessary steps to have the Belgians so arrested treated with humanity, defended and tried impartially."

The application in this case was made under the authority of these Articles.

ARTICLE XI of a Convention between the United States and Belgium "concerning the rights, privileges, and immunities of consular officers," concluded March 9, 1880, and proclaimed by the President of the United States, March 1, 1881, 21 Stat. 776, 781, is as follows:

"The respective consuls-general, consuls, vice-consuls, and

---

ART. 10. Lorsque les hommes appartenant à l'équipage d'un navire belge se rendent coupables de délits ou de crimes hors du navire, ou même à bord d . navire, mais euvers des personnes étrangères à l'équipage, le consul, si l'autorité locale les arrête ou procède contre eux, fera les démarches nécessaires pour que les Belges ainsi arrêtés soient traités avec humanité, défendus et jugés impartialement. Réglements Consulaires, Bruxelles, 1857, page 70.

consular agents shall have exclusive charge of the internal order of the merchant vessels of their nation, and shall alone take cognizance of all differences which may arise, either at sea or in port, between the captains, officers, and crews, without exception, particularly with reference to, the adjustment of wages and the execution of contracts. The local authorities shall not interfere, except when the disorder that has arisen is of such a nature as to disturb tranquillity and public order on shore, or in the port, or when a person of the country or not belonging to the crew, shall be concerned therein.

"In all other cases, the aforesaid authorities shall confine themselves to lending aid to the consuls and vice-consuls or consular agents, if they are requested by them to do so, in, causing the arrest and imprisonment of any person whose name is inscribed on the crew list, whenever, for any cause, the said officers shall think proper."

The claim of the consul was, that, by the law of nations, and the provisions of this treaty, the offence with which Wildenhus was charged is "solely cognizable by the authority of the laws of the Kingdom of Belgium," and that the State of New Jersey was without jurisdiction in the premises. The Circuit Court refused to deliver the prisoners to the consul and remanded them to the custody of the jailer. 28 Fed. Rep. 924. To reverse that decision this appeal was taken.

*Mr. F. R. Coudert* and *Mr. Edward K. Jones* for appellants.

I. The offence in question in this case is exclusively cognizable by the authority of the Kingdom of Belgium. (1) Under the general rules of international law, to which the practice of the United States conforms; and (2) By virtue of treaties between the United States and Belgium.

Mr. Wheaton, in his work on International Law, says: "International law, as understood among civilized nations, may be defined as consisting of *those rules of conduct which reason deduces, as consonant to justice, from the nature of the society existing among independent nations*, with such definitions and modifications as may be established by general con-

sent." Wheat. Int. Law (Dana's ed.), § 14; see also Halleck, Int. Law, 42; 1 Kent Com. 3. The *sources* and *evidence* of international law, aside from written conventions and treaties, are the *text-writers of authority*, showing what is the approved usage of nations, or the general opinion respecting their mutual conduct, with the definitions and modifications introduced by general consent. Wheat. Int. Law (Dana's ed.), § 15; 1 Kent Com. 18, 19. This "law of nations" is a part of the law of the land, and is obligatory upon the courts of the United States. *The Amelia,* 1 Cranch, 1; *S. C.* 4 Dall. 34; *The Charming Betsy,* 2 Cranch, 64, 118; *The Nereide,* 9 Cranch, 388; *The Estrella,* 4 Wheat. 298; *Holmes* v. *Jennison,* 14 Pet. 540, 569; *Henfield's Case,* Whart. St. Tr. 49–66. The general rule is well established, that the vessels of a nation are to be considered as a part of its territory, and the persons on board of them are deemed to be within the jurisdiction of such nation, and are protected and governed by the laws of the country to which such vessel belongs. Vattel Law of Nations, Book 1, c. 19, § 216; Wheat. Int. Law, 3d ed. 157; Wheat. Int. Law (Dana's ed.) § 106; 1 Kent Com. 26; *Crapo* v. *Kelly,* 16 Wall. 610; *In re Ah Sing,* 13 Fed. Rep. 286; Polson Int. Law, 25; 1 Massé Droit Commercial, 421, 423; 1 Ortolan Diplomatie de la Mer, 4th ed., Paris, 1864, 252, 292; Halleck Int. Law, 172, 173; 1 De Clerq et de Vallat Guide Pratique des Consulats, 366; 2 De Clerq Formulaires des Chancelleries, 65; 1 Requelmo Derecho Internacional, 243, 245.

The doctrine of the general international law is also in accordance with the established practice of the United States.

In commenting on the cases of *The Newton* and *The Sally* referred to by M. Massé, M. Ortolan very forcibly and pertinently observes: " These two cases are interesting from another point of view, which shows that the Americans, contrary to the opinion of one of their writers on international law, Mr. Wheaton, claim national jurisdiction of offences committed on board of their merchant vessels in a foreign port, when these offences have taken place only between the men of the crew, and the tranquillity of the port has not been broken; *in other words, this maritime power adopts the same principles that we do."*

. The action of our government, through its consuls at Antwerp and Marseilles, in the cases of *The Newton* and *The Sally*, in 1806, was soon afterwards followed by legislation affirming the principle of international law, declared and assented to by the two nations in those cases. The Crimes Act of March 3, 1825, c. 65, 4 Stat. 115, 116, after defining certain crimes committed at sea and other places within the admiralty jurisdiction of the United States, proceeds as follows:

"Sec. 5. And be it further enacted, that if any offence shall be committed on board of any ship or vessel, belonging to any citizen or citizens of the United States, *while lying in a port or place within the jurisdiction of any foreign state or sovereign,* by any person belonging to the company of said ship, or any passenger, on any other person belonging to the company of said ship, or any other passenger, the same offence shall be cognizable and punishable by the proper Circuit Court of the United States, in the same way and manner, and under the same circumstances, as if said offence had been committed on board of such ship or vessel on the high seas, and without the jurisdiction of such foreign sovereign or state; · *provided, always,* That if such offender shall be tried for such offence, and acquitted or convicted thereof, in any competent court of such foreign state or sovereign, he shall not be subject to another trial in any court of the United States."

The act of 1825 is carried into the present Revised Statutes, and the section here referred to reproduced in §§ 730, 5339, and 5345 of the latter. Since the passage of the act of 1825, numerous convictions have been had in Federal courts for crimes committed on board American vessels in foreign ports. See, among others, *United States* v. *Stevens*, 4 Wash. C. C. 547; *United States* v. *Seagrist*, 4 Blatchford, 420; *United States* v. *Bennett*, 3 Hughes, 466. In the case last cited, the rule is explicitly asserted that "the law of the United States follows an American vessel wherever she may be on navigable waters, so that an offence committed on board such vessel is an offence against the United States, *though the vessel be in a harbor or river of a foreign country.*"

The act of 1825 was followed in 1833 by the following in-

structions issued by Mr. Livingston, as Secretary of State, to the consuls of the United States in foreign countries. "Art. 36. Where piracy, mutiny, or any other offence against the laws of the United States shall have been committed on board of any vessel of the United States coming into the consular district, it is the duty of the consul, after taking the depositions necessary to establish the facts, to apply to the local authorities for means of securing the offenders while they remain in port, and to provide the means of sending them, without delay, to the United States for trial; and in all such cases where the vessel, on board which the offence was committed, is not bound to the United States, the consul is directed to procure two of the principal witnesses to be sent home with the person accused; and he is, at the same time, to transmit certified copies of all the depositions he has taken in relation to the offence; an exact detail of all its circumstances; and such information as may be-necessary to secure the conviction of the offenders." Consular Regulations of March 2, 1833. See also for the Diplomatic action of the government, Mr. Webster to Lord Ashburton, August 1, 1842.

II. The offence in question is exclusively cognizable by the authority of Belgium by virtue of treaties existing between that country and the United States. The provision of the treaty under which this proceeding is brought is as follows:

"ARTICLE XI.—The respective consuls-general, consuls, vice-consuls, and consular agents shall have exclusive charge of the internal order of the merchant vessels of their nation, and shall alone take cognizance of differences which may arise, either at sea or in port, between the captains, officers, and crews, without exception, particularly in reference to the adjustment of wages and the execution of contracts. The local authorities shall not interfere, except when the disorder that has arisen is of such a nature as to disturb tranquillity and public order on shore, or in the port, or when a person of the country or not belonging to the crew, shall be concerned therein."

As the Kingdom of Belgium, in its language, laws, and political history, is so intimately connected with the late Kingdom and present Republic of France, it may be useful, in

order to arrive at a proper interpretation of the meaning of this article of the Belgian treaty, to recur to similar provisions to be found in the treaties of France with the United States. The earliest provision upon the subject in question in a treaty to which the United States was a party, is to be found in the 8th Article of the treaty, between this country and France, of November 14, 1788. That Article is as follows:

"ARTICLE VIII. — The consuls or vice-consuls shall exercise police over all the vessels of their respective nations, and shall have on board the said vessels all power and jurisdiction in civil matters in all the disputes which may there arise; they shall have an entire inspection over the said vessels, their crew, and the changes and substitutions there to be made; for which purpose they may go on board the said vessels whenever they may judge it necessary. Well understood that the functions hereby allowed shall be confined to the interior of the vessels, and that they shall not take place in any case which shall have any interference with the police of the ports where the said vessels shall be."

The same provision was in substance reënacted by the treaty between the United States and France, of February 23, 1853, in the 8th Article. In every substantial respect these treaties correspond with the Belgian. In commenting upon the French treaties relative to the subject in question, M. Ortolan says:

"Various public treaties contain special clauses relative to the right of police, and of jurisdiction on French merchant vessels in foreign ports. Notwithstanding differences in the wording, the most important and recent are drawn in accordance with the spirit of the preceding principles; that is to say, in the sense of a distinction to be made between crimes or offences which do not extend beyond the interior and between men of the crew of the vessel, and those which concern the police of the port and compromise its tranquillity. Such was already in 1788 the convention of the 14th November between France and the United States." Ortolan Diplomatie de la Mer, 4th ed., p. 278.

M. Massé, in the passage above referred to, says: "A dis-

tinction is to be made between crimes and offences which' disturb the order of the place where the foreign vessel is, and those which disturb only *the internal order of the ship* — [et ceux qui ne portent atteinte qu'à *l'ordre intérieur du bâtiment*]. The former belong to the territorial jurisdiction; the latter are cognizable only by the nation to which belongs the vessel or the flag." Further on, in speaking of the cases of *The Newton* and *The Sally*, after referring to crimes that affect the police of the port, he says: "It is otherwise in case of offences committed on board of the foreign vessel by a man of the crew against another man of the same crew, because it concerns *the internal discipline of the vessel* — [parce qu'il s'agit alors *de la discipline intérieure du vaisseau*] — in which the local authority should not interfere when its assistance is not called for, or the tranquillity of the port is not broken." See also Dana's Note to Wheaton, §§ 95, 153; and for the principles for construing treaties see *United States* v. *Payne*, 8 Fed. Rep. 883; *Hauenstein* v. *Lynham*, 100 U. S. 483.

Since this class of treaties has been concluded, some modifications have been made in the instructions to consuls. See Consular Regulations of 1874, §§ 172–175, 194–196. These show that the rule of general international law, originally laid down in the cases of *The Newton* and *The Sally*, and asserted in this case, is considered by the United States as being embodied in all the recent treaties with foreign nations, in which the present treaty with Belgium is included.

If this be not so, then the United States has receded from its position in the cases of *The Newton* and *The Sally*, and repudiated the act of 1825, and Article 36 of the Consular Regulations of 1833. There is no evidence to show such recession and repudiation. On the contrary, the tendency of the whole history of the government has been in the direction of enlarging and extending the immunities and exemptions of its citizens from the authority of foreign nations.

The attitude and action of the executive department of the government upon questions of foreign relations furnishes a rule for observance by the judicial department, and in all cases that may arise with regard to questions of international

law it is the duty of the courts to adopt the determination of the other branch of the government upon such questions as the basis of their decisions. *United States* v. *Palmer*, 3 Wheat. 610, 634; *The Divina Pastora*, 4 Wheat. 52, 63; *The Santissima Trinidad*, 7 Wheat. 283, 337; *Foster* v. *Neilson*, 2 Pet. 253, 307. See also the able review of the decision of the Supreme Court of New York in the McLeod case, written by Judge Tallmadge and published in the Appendix to 26 Wendell, 663, 684.

*Mr. Coudert* and *Mr. Jones* also argued that the Federal courts had power to release the prisoners by writ of *habeas corpus*.

*Mr. C. H. Winfield* for appellee.

MR. CHIEF JUSTICE WAITE, after stating the case as above reported, delivered the opinion of the court.

By §§ 751 and 753 of the Revised Statutes the courts of the United States have power to issue writs of *habeas corpus* which shall extend to prisoners in jail when they are in "custody in violation of the Constitution or a law or treaty of the United States," and the question we have to consider is, whether these prisoners are held in violation of the provisions of the existing treaty between the United States and Belgium.

It is part of the law of civilized nations that when a merchant vessel of one country enters the ports of another for the purposes of trade, it subjects itself to the law of the place to which it goes, unless by treaty or otherwise the two countries have come to some different understanding or agreement; for, as was said by Chief Justice Marshall in *The Exchange*, 7 Cranch, 116, 144, "it would be obviously inconvenient and dangerous to society, and would subject the laws to continual infraction, and the government to degradation, if such . . . merchants did not owe temporary and local allegiance, and were not amenable to the jurisdiction of the country." *United States* v. *Diekelman*, 92 U. S. 520; 1 Phillimore's Int. Law, 3d ed. 483, § 351; Twiss' Law of Nations

in Time of Peace, 229, § 159.; Creasy's Int. Law, 167, § 176; Halleck's Int. Law, 1st ed. 171. And the English judges have uniformly recognized the rights of the courts of the country of which the port is part to punish crimes committed by one foreigner on another in a foreign merchant ship. *Regina* v. *Cunningham*, Bell C. C. 72; *S. C.* 8 Cox C. C. 104; *Regina* v. *Anderson*, 11 Cox C. C. 198, 201; *S. C.* L. R. 1 C. C. 161, 165; *Regina* v. *Keyn*, 13 Cox C. C. 403, 486, 525; *S. C.* 2 Ex. Div. 63, 161, 213. As the owner has voluntarily taken his vessel for his own private purposes to a place within the dominion of a government other than his own, and from which he seeks protection during his stay, he owes that government such allegiance for the time being as is due for the protection to which he becomes entitled.

From experience, however, it was found long ago that it would be beneficial to commerce if the local government would abstain from interfering with the internal discipline of the ship, and the general regulation of the rights and duties of the officers and crew towards the vessel or among themselves. And so by comity it came to be generally understood among civilized nations that all matters of discipline and all things done on board which affected only the vessel or those belonging to her, and did not involve the peace or dignity of the country, or the tranquillity of the port, should be left by the local government to be dealt with by the authorities of the nation to which the vessel belonged as the laws of that nation or the interests of its commerce should require. But if crimes are committed on board of a character to disturb the peace and tranquillity of the country to which the vessel has been brought, the offenders have never by comity or usage been entitled to any exemption from the operation of the local laws for their punishment, if the local tribunals see fit to assert their authority. Such being the general public law on this subject, treaties and conventions have been entered into by nations having commercial intercourse, the purpose of which was to settle and define the rights and duties of the contracting parties with respect to each other in these particulars, and thus prevent the inconvenience that might arise from attempts to exercise conflicting jurisdictions.

The first of these conventions entered into by the United States after the adoption of the Constitution was with France, on the 14th of November, 1788, 8 Stat. 106, "for the purpose of defining and establishing the functions and privileges of their respective consuls and vice-consuls," Art. VIII of which is as follows:

"The consuls or vice-consuls shall exercise police over all the vessels of their respective nations, and shall have on board the said vessels all power and jurisdiction in civil matters, in all the disputes which may there arise; they shall have an entire inspection over the said vessels, their crew, and the changes and substitutions there to be made; for which purpose they may go on board the said vessels whenever they may judge it necessary. Well understood that the functions hereby allowed shall be confined to the interior of the vessels, and that they shall not take place in any case which shall have any interference with the police of the ports where the said vessels shall be."

It was when this convention was in force that the cases of *The Sally* and *The Newton* arose, an account of which is given in Wheaton's Elements of International Law (3d ed.) 153, and in 1 Phillimore's International Law (3d ed.) 484 and (2d ed.) 407. *The Sally* was an American merchant vessel in the port of Marseilles, and *The Newton* a vessel of a similar character in the port of Antwerp, then under the dominion of France. In the case of *The Sally*, the mate, in the alleged exercise of discipline over the crew, had inflicted a severe wound on one of the seamen, and in that of *The Newton* one seaman had made an assault on another seaman in the vessel's boat. In each case the proper consul of the United States claimed exclusive jurisdiction of the offence, and so did the local authorities of the port; but the Council of State, a branch of the political department of the government of France to which the matter was referred, pronounced against the local tribunals, "considering that one of these cases was that of an assault committed in the boat of the American ship *Newton*, by one of the crew upon another, and the other was that of a severe wound inflicted by the mate of the American ship *Sally* upon

one of the seamen for having made use of the boat without leave." This was clearly because the things done were not such as to disturb "the peace or tranquility of the port." Wheaton's Elements Int. Law, 3d ed. 154. The case of *The Sally* was simply a quarrel between certain of the crew while constructively on board the vessel, and that of *The Newton* grew out of a punishment inflicted by an officer on one of the crew for disobedience of orders. Both were evidently of a character to affect only the police of the vessel, and thus within the authority expressly granted to the consul by the treaty.

No other treaty or convention bearing on this subject, to which our attention has been called, was entered into by the United States until a treaty with Sweden and Norway, on the 4th of September, 1816, 8 Stat. 232, where it was agreed, by Art. 5, that: "The consuls and their deputies shall have the right, as such, to act as judges and arbitrators in the differences which may arise between the captains and crews of the vessels of the nation whose affairs are intrusted to their care. The respective governments shall have no right to interfere in matters of this kind, except the conduct of the captain or crew shall disturb the peace and tranquillity of the country in which the vessel may be, or the consul of the place shall feel himself obliged to resort to the interposition and support of the executive authority to cause his decision to be respected and maintained. It being, nevertheless, understood that this kind of judgment or award shall not deprive the contending parties of the right which they have, on their return, to recur to the judicial authorities of their own country."

Substantially the same provision is found in treaties or conventions concluded with Prussia in 1828, Art X, 8 Stat. 382; with Russia in 1832, Art. VIII, id. 448; with Greece in 1837, Art. XII, id. 504; with Hanover in 1840, Art. VI, id. 556; with Portugal also in 1840, Art. X, id. 564; with the Grand Duchy of Mecklenburg-Schwerin in 1847, Art. IX, 9 Stat. 916; with Oldenburg in 1847, id. 868; with Austria in 1848, Art. IV, id. 946; with the Hanseatic Republics in 1852, Art. I, 10 Stat. 961; with the Two Sicilies in 1855, Art. XIX, 11 Stat.

650; with Denmark in 1861, Art. I, 13 Stat. 605; and with the Dominican Republic in 1867, Art. XXVI, 15 Stat. 487.

In a convention with New Grenada concluded in 1850 the provision was this:

"They [the consuls, &c.] may cause proper order to be maintained on board of vessels of their nation, and may decide on the disputes arising between the captains, the officers, and the members of the crew, unless the disorders taking place on board should disturb the public tranquillity, or persons not belonging to the crew or to the nation in whose service the consul is employed; in which case the local authorities may interfere." Art. III, clause 8, 10 Stat. 903.

Following this was a convention with France, concluded in 1853, 10 Stat. 996, Art VIII of which is as follows:

"The respective consuls-general, consuls, vice-consuls, or consular agents, shall have exclusive charge of the internal order of the merchant vessels of their nation, and shall alone take cognizance of differences which may arise, either at sea or in port, between the captain, officers, and crew, without exception, particularly in reference to the adjustment of wages and the execution of contracts. The local authorities shall not, on any pretext, interfere in these differences, but shall lend forcible aid to the consuls, when they may ask it, to arrest and imprison all persons composing the crew whom they may deem it necessary to confine. Those persons shall be arrested at the sole request of the consuls, addressed in writing to the local authority, and supported by an official extract from the register of the ship or the list of the crew, and shall be held, during the whole time of their stay in the port, at the disposal of the consuls. Their release shall be granted at the mere request of the consuls made in writing. The expenses of the arrest and detention of those persons shall be paid by the consuls."

The same provision in substantially the same language was embraced in a convention with Italy in 1868, Art. XI, 15 Stat. 609; and in another with Belgium, also in 1868, Art. XI, 16 Stat. 761. This convention with Belgium continued in force until superseded by that of 1880–81, under which the present controversy arose.

The form of the provision found in the present convention with Belgium first appeared in a convention with Austria concluded in 1870, Art. XI, 17 Stat. 827, and it is found now in substantially the same language in all the treaties and conventions which have since been entered into by the United States on the same subject. See the conventions with the German Empire in 1871, Art. XIII, 17 Stat. 927; with the Netherlands in 1878, Art. XI, 21 Stat. 668; with Italy in 1881, Art. I, 22 Stat. 832; with Belgium in 1881, as stated above; and with Roumania the same year, Art. XI, 23 Stat. 714.

It thus appears that at first provision was made only for giving consuls police authority over the interior of the ship and jurisdiction in civil matters arising out of disputes or differences on board, that is to say, between those belonging to the vessel. Under this police authority the duties of the consuls were evidently confined to the maintenance of order and discipline on board. This gave them no power to punish for crimes against the peace of the country. In fact, they were expressly prohibited from interfering with the local police in matters of that kind. The cases of *The Sally* and *The Newton* are illustrative of this position. That of *The Sally* related to the discipline of the ship, and that of *The Newton* to the maintenance of order on board. In neither case was the disturbance of a character to affect the peace or the dignity of the country.

In the next conventions consuls were simply made judges and arbitrators to settle and adjust differences between those on board. This clearly related to such differences between those belonging to the vessel as are capable of adjustment and settlement by judicial decision or by arbitration, for it simply made the consuls judges or arbitrators in such matters. That would of itself exclude all idea of punishment for crimes against the State which affected the peace and tranquillity of the port; but, to prevent all doubt on this subject, it was expressly provided that it should not apply to differences of that character.

Next came a form of convention which in terms gave the consuls authority to cause proper order to be maintained on

board and to decide disputes between the officers and crew, but allowed the local authorities to interfere if the disorders taking place on board were of such a nature as to disturb the public tranquillity, and that is substantially all there is in the convention with Belgium which we have now to consider. This treaty is the law which now governs the conduct of the United States and Belgium towards each other in this particular. Each nation has granted to the other such local jurisdiction within its own dominion as may be necessary to maintain order on board a merchant vessel, but has reserved to itself the right to interfere if the disorder on board is of a nature to disturb the public tranquillity.

The treaty is part of the supreme law of the United States, and has the same force and effect in New Jersey that it is entitled to elsewhere. If it gives the consul of Belgium exclusive jurisdiction over the offence which it is alleged has been committed within the territory of New Jersey, we see no reason why he may not enforce his rights under the treaty by writ of *habeas corpus* in any proper court of the United States. This being the case, the only important question left for our determination is whether the thing which has been done — the disorder that has arisen — on board this vessel is of a nature to disturb the public peace, or, as some writers term it, the "public repose" of the people who look to the state of New Jersey for their protection. If the thing done — "the disorder," as it is called in the treaty — is of a character to affect those on shore or in the port when it becomes known, the fact that only those on the ship saw it when it was done is a matter of no moment. Those who are not on the vessel pay no special attention to the mere disputes or quarrels of the seamen while on board, whether they occur under deck or above. Neither do they as a rule care for anything done on board which relates only to the discipline of the ship, or to the preservation of order and authority. Not so, however, with crimes which from their gravity awaken a public interest as soon as they become known, and especially those of a character which every civilized nation considers itself bound to provide a severe punishment for when com-

mitted within its own jurisdiction. In such cases inquiry is certain to be instituted at once to ascertain how or why the thing was done, and the popular excitement rises or falls as the news spreads and the facts become known. It is not alone the publicity of the act, or the noise and clamor which attends it, that fixes the nature of the crime, but the act itself. If that is of a character to awaken public interest when it becomes known, it is a "disorder" the nature of which is to affect the community at large, and consequently to invoke the power of the local government whose people have been disturbed by what was done. The very nature of such an act is to disturb the quiet of a peaceful community, and to create, in the language of the treaty, a "disorder" which will "disturb tranquillity and public order on shore or in the port." The principle which governs the whole matter is this: Disorders which disturb only the peace of the ship or those on board are to be dealt with exclusively by the sovereignty of the home of the ship, but those which disturb the public peace may be suppressed, and, if need be, the offenders punished by the proper authorities of the local jurisdiction. It may not be easy at all times to determine to which of the two jurisdictions a particular act of disorder belongs. Much will undoubtedly depend on the attending circumstances of the particular case, but all must concede that felonious homicide is a subject for the local jurisdiction, and that if the proper authorities are proceeding with the case in a regular way, the consul has no right to interfere to prevent it. That, according to the petition for the *habeas corpus*, is this case.

This is fully in accord with the practice in France, where the government has been quite as liberal towards foreign nations in this particular as any other, and where, as we have seen in the cases of *The Sully* and *The Newton*, by a decree of the Council of State, representing the political department of the government, the French courts were prevented from exercising jurisdiction. But afterwards, in 1859, in the case of *Jally*, the mate of an American merchantman, who had killed one of the crew and severely wounded another on board the ship in the port of Havre, the Court of Cassation, the highest judicial

tribunal of France, upon full consideration held, while the Convention of 1853 was in force, that the French courts had rightful jurisdiction, for reasons which sufficiently appear in the following extract from its judgment:

"Considering that it is a principle of the law of nations that every state has sovereign jurisdiction throughout its territory;

"Considering that by the terms of Article 3 of the Code Napoleon the laws of police and safety bind all those who inhabit French territory, and that consequently foreigners, even *transeuntes*, find themselves subject to those laws;

"Considering that merchant vessels entering the port of a nation other than that to which they belong cannot be withdrawn from the territorial jurisdiction, in any case in which the interest of the state of which that port forms part finds itself concerned, without danger to good order and to the dignity of the government;

"Considering that every state is interested in the repression of crimes and offences that may be committed in the ports of its territory, not only by the men of the ship's company of a foreign merchant vessel towards men not forming part of that company, but even by men of the ship's company among themselves, whenever the act is of a nature to compromise the tranquillity of the port, or the intervention of the local authority is invoked, or the act constitutes a crime by common law," (*droit commun*, the law common to all civilized nations,) "the gravity of which does not permit any nation to leave it unpunished, without impugning its rights of jurisdictional and territorial sovereignty, because that crime is in itself the most manifest as well as the most flagrant violation of the laws which it is the duty of every nation to cause to be respected in all parts of its territory."[1] 1 Ortolan Diplomatie de la Mer (4th ed.), pp. 455, 456; Sirey (N. S.), 1859, p. 189.

*The judgment of the Circuit Court is affirmed.*

[1] "Attendu que c'est un principe du droit des gens que chaque État a la juridiction souveraine dans l'étendue de tout son territoire;

"Attendu qu'aux termes de l'article 3 du Code Napoléon, les lois de police et de sûreté obligent tous ceux qui habitènt le territoire français, et que, par suite, les étrangers, même *transeuntes*, s'y trouvent soumis;

---

" Attendu que les bâtiments de commerce entrant dans le port d'une nation autre que celle à laquelle ils appartiennent ne pourraient être soustraits à la juridiction territoriale, toutes les fois que l'intérêt de l'État dont ce port fait partie se trouve engagé, sans danger pour le bon ordre et la dignité du gouvernement;

"Attendu que tout État est intéressé à la répression des crimes et délits qui peuvent être commis dans les ports de son territoire, non-seulement par des hommes de l'équipage d'un bâtiment du commerce étranger envers des personnes ne faisant pas partie de cet équipage, mais même par des hommes de l'équipage entre eux; soit lorsque le fait est de nature à compromettre la tranquillité du port, soit lorsque l'intervention de l'autorité locale est réclamée, soit lorsque le fait constitue un crime de droit commun que sa gravité ne permet à aucune nation de laisser impuni, sans porter atteinte à ses droits de souveraineté juridictionelle et territoriale, parce que ce crime est par lui-même la violation la plus manifeste comme la plus flagrante des lois que chaque nation est chargée de faire respecter dans toutes les parties de son territoire."