## JOHN MAHONEY vs. THE BRITISH SHIP "BRENDA."

### March 2, 1906.

*Jurisdiction—Assault on board a British Ship in an American Port:*
There being no provision in the treaties between Great Britain and the
United States exempting a British ship while in an American port from
the jurisdiction of the United States courts, such jurisdiction may be as-
sumed, especially in the case of an alleged serious assault on board of a
British ship.

*Desertion—Forfeiture of Wages:* Under the "Merchant Shipping
Act, 1894," of England, a seaman of a British ship leaving the ship in a for-
eign port for "sufficient reasons," such a chronic rheumatism of a painful
character, does not thereby forfeit his wages.

*Incapacity—Deduction of Wages:* Where a seaman on a British ship
is incapacitated from performing his duties as a member of the crew on
account of illness which has not "been caused by his own wilful act or
default," he is entitled to his wages for such period of incapacity.

*Construction—British Shipping Act:* The British shipping act, being
harsh in its provisions toward seamen and creating a servile condition,
should be liberally construed in favor of seamen.

In Admiralty: Libel *in rem* for wages and damages for
breach of contract.

Geo. A. Davis, Proctor for Libellant.
J. J. Dunne, Proctor for Libellee.

DOLE, J.  This is a libel *in rem* for wages and damages for
breach of contract.  The libellant is a citizen of the United
States who shipped on the British ship "Brenda," the libellee,
at Hamburg, Germany, May 23, 1905.  The libellant com-
plains that the ship arrived at the port of Honolulu about Octo-
ber 5th, 1905, and on the 14th day of October he was wantonly
and cruelly assaulted by the master and was compelled by rea-
son thereof to leave the ship, and that there is now due and
owing him for wages $50, and for the damages on account of
such assault he claims $200.  The master intervening on be-
half of the owners, has filed an answer in which he pleads to
the jurisdiction and says that the libellant being a member of

the crew of a British merchant ship by shipping articles executed between the ship and the libellant pursuant to "An Act to consolidate enactments relating to merchant shipping," and commonly known as the "Merchant Shipping Act, 1894," the court should not take jurisdiction but should remand the parties to their rights and remedies as provided by said Merchant Shipping Act of 1894. The answer also denies the assault and states that on the 16th of October, two days after the alleged assault, the master of the ship asked the libellant if he was going to work and the libellant answered that he was not able to work, whereupon he was informed that if he was ill he would have to enter the ship's hospital, whereupon the libellant then and there deserted the ship in wilful violation of his said contract for services, and thereby forfeited his wages and effects to said ship as provided in the said Merchant Shipping Act of 1894; and that he, the master, thereupon entered the libellant in the office of the British Consul for said port of Honolulu as a deserter from said ship, and also made a similar entry in the official log book of the ship. The answer contains copies of certain parts of the Merchant Shipping Act of 1894, which, by stipulation of counsel, are accepted as correctly transcribed, and to be received as evidence in the case.

While it is true that the libellant in this case, although an American citizen, is, so far as his relation with the ship is concerned and during his status of a member of the crew thereof, presumed to be of the same nationality as the ship (Hughes, Admiralty, pages 24-25), yet it does not thereby appear that this court is without jurisdiction in the case.

In the *Wildenhus's Case,* 120 U. S. 1, 11, the law is laid down as follows:

"It is part of the law of civilized nations that when a merchant vessel of one country enters the ports of another for the purpose of trade, it subjects itself to the law of the place to which it goes, unless by treaty or otherwise the two countries have come to a different understanding or agreement; for, as

wâs said by Chief Justice Marshall in *The Exchange*, 7 Cranch, 116, 144, 'It would be obviously inconvenient and dangerous to society, and would subject the laws to continual infraction, and the government to degradation, if such * * * merchants did not owe temporary and local allegiance, and were not amenable to the jurisdiction of the country.' "

The case further defines this position, on page 18, as follows:

"The principle which governs the whole matter is this: Disorders which disturb only the peace of the ship or those on board are to be dealt with exclusively by the sovereignty of the home of the ship, and those which disturb the public peace may be suppressed, and, if need be, the offenders punished by the proper authorities of the local jurisdiction. It may not be easy at all times to determine to which of the two jurisdictions a particular act of disorder belongs. Much will undoubtedly depend on the attending circumstances of the particular case."

Counsel for the libellee has failed to cite any treaty provision between the United States and Great Britain which exempts a British ship in an American port from the jurisdiction of the United States courts, and I have been unable to find any such provision. This is a case which is, I think, well within the jurisdiction of a federal court, if such court chooses to act in the matter, inasmuch as the allegations of the libel would tend to show an assault of a cruel, violent and unjustifiable nature; moreover, it would be a hardship to the sailor to be compelled to seek his forum in the jurisdiction to which his ship belongs for the trial of his complaint.

As to the facts of the case relating to the alleged assault, the testimony of the libellant would, if believed, show an assault upon him,—a man weakened by a long period of illness of the nature of chronic rheumatism, by a vigorous and powerful man, of such a character as would entitle him to damages. It, however, further appears by the evidence that at the time of the alleged assault, the libellant was considerably under the

influence of liquor. His one witness, introduced to support his story of the assault, was Camille van Remoortele, otherwise known as Bismark, who testified that he was the watchman of the ship at the time. His evidence was that the libellant was drunk and noisy at the time of the alleged assault; that the captain sent witness forward to tell the libellant to be quiet and that the libellant thereupon used offensive language toward the master; that the master then went forward and took him by the arm and told him to make less noise and tried to get him off the forecastle-head where he was at the time; and that upon the libellant's shouting "murder," "watch" and "help," the captain let go of him and went aft. His evidence shows that there was no assault, no choking of the man as complained of by the libellant, and nothing whatever beyond taking hold of him and trying to get him off the forecastle-head; and that when libellant resisted and cried out the master desisted and left him alone. The master's evidence agrees substantially with that of this witness except that he says libellant cried out "murder," etc., when he was not touching him and was some distance away. There was no other evidence relating to the assault. Two days afterwards, as stated above, the libellant left the ship on being told that if he was ill he must go into the ship's hospital. He made no complaint at the British Consulate of the alleged assault. With this evidence I cannot find that he has made out his case for damages on account of the assault.

The question remains whether under the Merchant Shipping Act referred to, libellant has forfeited his wages by his desertion of the ship, the allegation of such desertion being fully borne out by the evidence.

Section 158 of the said Shipping Act is as follows:

"When the service of a seaman terminates before the date contemplated in the agreement, by reason of the wreck or loss of the ship, or of his being left on shore at any place abroad under a certificate granted as provided by this Act of his unfitness or inability to proceed on the voyage, he shall be entitled

to wages up to the time of such termination, but not for any longer period."

Under the provisions for the certificate referred to in this section, contained in section 188 of said Shipping Act, the British Consul had authority on a proper showing to grant the same. This section not being within the citations of the Act in the answer, allowed to be correct by counsel, the counsel for libellee very honorably consented to have it recognized by the court.

Section 160 of the Shipping Act provides that:

"Where a seaman is by reason of illness incapable of performing his duty, and it is proved that the illness has been caused by his own wilful act or default, he shall not be entitled to wages for the time during which he is by reason of the illness incapable of performing his duty."

Section 231 of the Shipping Act, referring to facilities for proving desertion in proceedings for forfeiture of wages, provides that:

"(1)   Whenever a question arises whether the wages of any seaman or apprentice are forfeited for desertion from a ship, it shall be sufficient for the person insisting on the forfeiture to show that the seaman or apprentice was duly engaged in or belonged to the ship, and either that he left the ship before the completion of the voyage or engagement, or, if the voyage was to terminate in the United Kingdom and the ship has not returned, that he is absent from her, and that an entry of his desertion has been duly made in the official log book.   (2)   The desertion shall thereupon, so far as relates to any forfeiture of wages under this part of this Act, be deemed to be proved, unless the seaman or apprentice can produce a proper certificate of discharge, or can otherwise show to the satisfaction of the court that he had sufficient reasons for leaving the ship."

Section 233 of the Shipping Act provides that:

"Any question concerning the forfeiture of or deductions from the wages of a seaman or apprentice may be determined in any proceeding lawfully instituted with respect to those wages,

notwithstanding that the offense in respect of which the question arises, though by this Act made punishable by imprisonment as well as forfeiture, has not been made the subject of any criminal proceeding."

In the case before the court, it is shown that the libellant was attacked with rheumatism after having been to sea a week or ten days. There is nothing to show that he was not a well man at the time of his engagement. He continued to suffer under this attack during the voyage up to the arrival of the ship in Honolulu to an extent that partially incapacitated him from performing his duties as a member of the crew. He could not go aloft nor take the wheel, except on calm days, but was limited to light duties on the deck, such as serving on the lookout,—in which case he was allowed an opportunity of sitting down,—and making sennite, assisting in making sail and doing a little mending. For a period of about forty days he was totally incapacitated from any service, during which time he suffered severe pain. For this period of incapacity, the captain, with the consent of the consul at Honolulu, deducted his wages. After the arrival of the ship at Honolulu and before the alleged assault, he applied to the master for his discharge; on the 16th of October he left the ship.

From all of the evidence, it is clear that the libellant was in a pitiable condition of ill health during the greater part of the voyage and up to the time of his leaving the ship. It seems to me that he was then in no condition to go to sea. One of his reasons for wishing a discharge was that he was afraid of the master and another reason was his ill health. The contention of the libellee that his state of ill health was caused by his own wilful act or default is not proved to my satisfaction. Although he had suffered from rheumatism during his service on the Western coast of America in the light-house service, yet from his own testimony he had been free from the disease for a long period and went on board the ship as a well man and there is no sufficient evidence that a renewal of the disease was in consequence of his own neglect or wilful act.

By the Merchant Shipping Act, 1894, Sec. 233, cited above, the question concerning the forfeiture of wages of or deduction from the wages of seamen may be determined in any proceeding lawfully instituted with respect to such wages, which, under the ruling above as to the discretion of this court to entertain jurisdiction in the case, gives this court jurisdiction to decide that question.    It appears to me that the libellant had sufficient reason for leaving the ship on account of the condition of his health and that such condition of health, not having been shown to have been brought on by his own wilful act or default, the deduction against his wages made by the master on account of his incapacity for work during forty days was unauthorized. The British legislation, as well as that of the United States, in relation to seamen, being harsh in character and creating a servile status, should be liberally construed in favor of the sailor.    The impression made upon me by the evidence in this case is that the refusal of the master to discharge the libellant at his request, was far from humane.

I find, therefore, that the libellant is entitled to the wages due him at the time of his leaving the ship on the 16th of October last, amounting to £14 6s., less £3 advanced him at the time of shipping, £4 2s. 4d, his slop-chest account, and $1.00 advanced him by the master in Honolulu, leaving a balance of $33.96 in American money.    Decree will be made for that amount with costs.