337 F.2d 777
 Quintino LOPES, Appellant,
v.
Liberian S.S. OCEAN DAPHNE, her boats, engines, tackle,
apparel, etc., M. T. Andersen, individually and as master,
Ocean Carriers, Inc., Norlo Shipping Co., Inc., Seatraders,
Inc., Maritime Overseas Corporation, and Orion Shipping&
Trading Corporation, all foreign corporations or
associations, as owners and/or operators of the Liberian
S.S. Ocean Daphne, Appellees.
 No. 9282.
 United States Court of Appeals Fourth Circuit.
 Argued June 18, 1964.
Decided Sept. 24, 1964.
 
 Burt M. Morewitz, Newport News, Va., for appellant.
 John W. Winston, Norfolk, Va. (Seawell, McCoy, Winston & Dalton, Norfolk, Va., on brief), for appellees.
 Before SOBELOFF, Chief Judge, J. SPENCER BELL, Circuit Judge, and HEMPHILL, District Judge.
 J. SPENCER BELL, Circuit Judge.
 
 
 1
 The significant question raised by this appeal is whether certain sections of the Merchant Seamen's Act[1] apply where a foreign seaman ships aboard a foreign flag vessel which is owned and operated by a U.S. corporation. We think the answer must be 'No', because it was not the intent of Congress that these statutes should apply to foreign flag vessels using foreign crews, whether or not they are owned and operated by American citizens.
 
 
 2
 The libellant Lopes, a foreign seaman, shipped at Baltimore aboard the S.S. Ocean Daphne, which was registered under the laws of Liberia and flew that flag. The vessel was owned and operated by Ocean Carriers, Inc., a New York corporation, and engaged in foreign commerce between ports of the United States and Europe. The articles signed by libellant complied with Liberian law but not with the above sections of the Act. He seeks the penalties prescribed by section 575 of the Act.
 
 
 3
 We cannot distinguish the case in principle from the recent decisions of the Supreme Court in McCulloch v. Sociedad Nacional de Marineros de Honduras, 372 U.S. 10, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963); Incres S.S. Co. v. International Maritime Workers, 372 U.S. 24, 83 S.Ct. 611, 9 L.Ed.2d 557 (1963); and Benz v. Compania Naviera Hidalgo, 353 U.S. 138, 77 S.Ct. 699, 1 L.Ed.2d 709 (1957). In Benz the Court declined to apply the provisions of the Taft-Hartley amendments to the National Labor Relations Act in a suit for damages 'resulting from the picketing of a foreign ship operated entirely by foreign seamen under foreign articles while the vessel was temporarily in an American port.' The vessel in question was owned by a Panamanian corporation and flew the Liberian flag. The crew were nationals of countries other than the United States. The only American contact was that the vessel was transiently in a United States port and American labor unions participated in its picketing. The Court found nothing in the Act itself or its legislative history to indicate a clearly expressed affirmative intent on the part of Congress that it apply to foreign seamen on foreign flag vessels in United States ports.
 
 
 4
 In McCulloch the National Labor Relations Board had asserted its jurisdiction over a representation election aboard a vessel registered under the laws of Honduras and flying the Honduran flag. The crew was foreign. The vessel was owned by a Honduran corporation which was a wholly owned subsidiary of an American corporation and was regularly engaged in commerce between Central and Sough American and U.S. ports. The Supreme Court affirmed the action of the United States District Court for the District of Columbia in enjoining the Board's action holding that the Act did not give the Board jurisdiction over foreign flag vessels carrying foreign crews. The Court conceded the power of Congress to make laws affecting foreign flag vessels in American ports and waters, but the Court held that it would not construe the Act to so apply in the absence of clearly expressed specific intent on Congress' part, which it did not find in this case. The Court rejected the Board's test for finding the Act applicable wherein it sought to strike a balance between the vessel's contacts with its flag country and those which it had with the United States.[2] In rejecting the Board's approach, the Court foreclosed the possibility of drawing a distinction between the factual situation existing in Benz, where a foreign flag vessel was foreign owned and only transiently in a U.S. port, and that existing in McCulloch, where a foreign flag vessel was beneficially U.S. owned and shipped regularly out of U.S. ports. The vessel in McCulloch did, however, substantially affect the commerce of Honduras, the nation whose flag it flew.
 
 
 5
 In Incres the Court again refused to apply the Act where the vessel was a foreign flag vessel (Liberian) beneficially owned by Italian nationals, but regularly engaged for seven months in the year running cruises out of U.S. ports and did not substantially affect the commerce of the nation (Liberia) whose flag it flew. The conclusion is inescapable that the Court will not apply American law affecting internal management to foreign flag vessels in the absence of a clearly expressed specific intent on the part of Congress, and this is true without regard to the beneficial ownership of such vessel.
 
 
 6
 The libellant contends that Congress clearly and specifically expressed its intent that the sections in question of the Merchant Seamen's Act should apply to a foreign flag vessel which is U.S. owned, thus distinguishing his case from Benz, McCulloch, and Incres. He purports to find this intention in the language of section 713,[3] which is the definition section of the Act. We must confess that a superficial consideration of the case lends some support to this argument. It is true that the section uses the phrase 'vessel belonging to any citizen of the United States' in defining the terms 'owner', 'master', and 'seaman' as used throughout the Act. It is equally true that in refusing to apply the sections in question of this Act to 'foreign vessels' as distinguished from 'American vessels', the courts have pointed to this phrase in the definition section as one justification for their decisions.[4] But in those cases the vessels were foreign owned as well as foreign registered, and there was no need to distinguish between a foreign registered vessel which was foreign owned and a foreign registered vessel which was U.S. owned. Not only was the distinction not necessary in those cases, but it also was not important in the history of shipping before the mass flight of the American merchant fleet to the Panlibhon flags of convenience to escape the burden of U.S. taxation and other expenses of American registration in the years just prior to World War II.
 
 
 7
 In this historical context, the dichotomy between U.S. and foreign vessels then before Congress did not involve the category of U.S. owned-foreign registered vessels. Thus the provisions contained in section 597[5] expressly making them applicable to seamen on 'foreign vessels' entering U.S. ports, i.e., foreign flag vessels which invariably were foreign owned, do not ipso facto indicate Congress' intention in the present situation, but it may indicate a general intent that the remainder of the Act should not impinge upon the rule of international maritime law which holds that the internal economy and management of a vessel should normally be controlled by the law of the flag. Cf. Wildenhus' Case, 120 U.S. 1, 12, 7 S.Ct. 385, 30 L.Ed. 565 (1887). See also Lauritzen v. Larsen, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953), and footnote 9 in McCulloch, discussing the application of the Jones Act, 46 U.S.C.A. 688, and distinguishing those cases on the ground that the application of that Act does not affect 'the pervasive regulation of the internal order of a ship.' There can be no doubt that the application of the sections of the Merchant Seamen's Act here in question would affect 'the pervasive regulation of the internal order of a ship.'
 
 
 8
 In Ktistakis v. Liberian S.S. Star, 304 F.2d 356 (4 Cir. 1962), this court refused to apply the Act to a foreign registered vessel which was foreign owned, and in doing so it followed the lead of the older cases in relying upon the language of this section. The dictum in that opinion to the effect that the sections under consideration were 'intended to apply to vessels belonging to citizens of the United States' was declared prior to the decisions in McCulloch and Incres, which show the dictum to be in error. We welcome the opportunity to limit that decision to its facts.
 
 
 9
 In view of the fact that the statute was enacted more than 100 years before the flag of convenience problem arose, we cannot find in Congress' use of this phrase in a definition section-- one concerned primarily with defining the relationships between seamen and masters rather than the extent of the application of American laws to foreign vessels-- the necessary clear and specific Congressional intent called for by the Benz, McCulloch, and Incres decisions. Having come to this conclusion, we do not reach the questions raised by the existence of our treaties with Liberia[6] entered into since the enactment of the Merchant Seamen's Act. Whatever hope may have existed for the construction contended for by the libellant before McCulloch, it no longer exists.
 
 
 10
 We have considered the libellant's claim for liquidated damages and find it without merit.
 
 
 11
 Affirmed.
 
 
 
 [1]
 46 U.S.C.A. 564, 575, 578. Section 564 provides that the master of every vessel bound from a port in the United States (with certain exceptions not here pertinent) must make an agreement in writing with each of his crewmen and specifies certain particulars which the agreement must set forth including 'the nature and, as far as practicable, the duration of the intended voyage or engagement, and the port or country at which the voyage is to terminate.' Section 575 provides that if the master shall carry out a seaman without signed articles, he shall pay to such seaman the highest wages which shall have been given at such port within three months next before the time of such shipping. Section 578 provides that shipments made contrary to any Act of Congress shall be void, and a seaman so shipped may leave the service at any time and shall be entitled to recover the highest rate of wages of the port from which he was shipped
 Sections 564 and 578 of the United States Code Annotated are derived from Acts of July 20, 1840, ch. 48, 5 Stat. 395; June 7, 1872, ch. 322, 12, 15, 17 Stat. 265; Jan. 15, 1873, ch. 35, 17 Stat. 410. Section 575 of the Code derives from Act of July 20, 1790, ch. 29, 1, 1 Stat. 131. These later became 4511, 4523, and 4521 of the Revised Statutes of 1878.
 
 
 [2]
 It is interesting to note that the Court rejected a more definitive test recommended by the Solicitor General which would have allowed the Court to reserve for a later decision the question of whether the Act applied to: '(A) vessel whose beneficial ownership and management are primarily vested in nationals of the U.S. and which plys regularly between a port of the United States and foreign ports without being used substantially to meet the shipping needs of the nation whose flag she flies.' Comment, Flags of Convenience and National Labor Policy, 42 Texas L.Rev. 842, 858 (1964)
 
 
 [3]
 46 U.S.C.A. 713 provides that:
 'In the construction of title 53 of the Revised Statutes, every person having the command of any vessel belonging to any citizen of the United States shall be deemed to be the 'master' thereof; and every person (apprentices excepted) who shall be employed or engaged to serve in any capacity on board the same shall be deemed and taken to be a 'seaman'; and the term 'vessel' shall be understood to comprehend every description of vessel navigating on any sea or channel, lake or river, to which the provisions of such title may be applicable, and the term 'owner' shall be taken and understood to comprehend all the several persons, if more than one, to whom the vessel shall belong.'
 
 
 [4]
 Grant v. United States, 58, 694 (9 Cir. 1893) (British vessel and presumably British seamen); The Elswick Tower, 241 706, 86 Ct.Cl. 136, (S.D.Ga.1917) (British vessel, foreign seamen and an American seaman who signed Articles abroad); United States v. Minges, 16, 657, (C.C.S.C.1883) (Norwegian vessel and presumably Norwegian crewmen, in a case involving the crime of harboring deserting seamen, then a part of the Act but repealed in 1898); The Montapedia, 14, 427 (C.C.E.D.La.1882) (Chinese subjects on British vessel). See Comment, supra note 2; Comment, 69 Yale L.J. 498 (1960)
 
 
 [5]
 46 U.S.C.A. 597 provides that:
 'Payment at ports. Every seaman on a vessel of the United States shall be entitled to receive on demand from the master of the vessel to which he belongs one-half part of the balance of his wages earned and remaining unpaid at the time when such demand is made at every port where such vessel, after the voyage has been commenced, shall load or deliver cargo before the voyage is ended, and all stipulations in the contract to the contrary shall be void: * * * And provided further, That this section shall apply to seamen on foreign vessels while in harbors of the United States, and the courts of the United States shall be open to such seamen for its enforcement.'
 
 
 [6]
 Treaty of Friendship, Commerce and Navigation between the United States of America and Liberia, 54 Stat. 1739 Nov. 21, 1939); Convention Between the United States of America and Liberia Respecting Consular Officers, 54 Stat. 1751 (Nov. 21, 1939); Convention on the High Seas Treaties in Force 286 (Dept. State Pub. No. 7481 (1963))