[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUL 06, 2006
THOMAS K. KAHN
CLERK

_____

No. 05-12077

_____

D. C. Docket No. 04-20072-CR-ASG

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RICK DEAN STICKLE,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(July 6, 2006)**

Before ANDERSON, FAY and SILER*, Circuit Judges.

FAY, Circuit Judge:

_____
*Honorable Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit, sitting by designation.

This case involves the deliberate pollution of international waters and whether this defendant was properly charged and tried in this district court. Appellant appeals his convictions for one count of conspiring to violate the laws of the United States and one count of knowingly discharging an oily mixture into the sea without an oil discharge monitoring system. Rick Dean Stickle was the Chairman and Owner of Sabine Transportation Company, which managed and operated oceangoing vessels engaged in transporting various cargoes. While crossing the South China Sea on a return voyage to the United States, laborers of the S.S. Juneau discharged contaminated wheat and diesel fuel into the sea without the use of an oil monitoring and discharge control system. Stickle was tried by a jury which adjudicated him guilty on both counts. He contends that the indictment should have been dismissed because the Juneau was not a freight vessel as defined in the charged statutes. He further asserts that the government was required to prove venue beyond a reasonable doubt and that the evidence presented at trial was insufficient to establish venue in the Southern District of Florida. Finding no merit in these contentions, we affirm.

## I. Factual Background

Sabine Transportation Company ("Sabine") owned, managed and operated a fleet of older tank ships used to transport cargo. Sabine is one of several

corporations headquartered in Cedar Rapids, Iowa, collectively known as Stickle Enterprises. Rick Dean Stickle was the Owner and Chairman of Stickle Enterprises. Stickle was an intensely hands-on manager who regularly involved himself in the business' daily operations and decision making. Stickle and the operation managers were in constant communication with their vessels either by fax, email or telephone. In addition, Stickle met with operation managers on a daily basis to discuss the daily reports from vessels at sea.

In 1998, Sabine purchased the S.S. Juneau, an aging, single-hulled vessel, originally built as an oil tanker. The Juneau was immediately designated to carry a cargo of wheat for CARE and World Food Programs from Portland, Oregon to Bangladesh. Sabine purchased the Juneau with the intention of making a single trip to transport wheat abroad. In order to accomplish this trip, Sabine had the Coast Guard certify the Juneau to carry wheat (as opposed to oil), that is, certify the Juneau as a freight vessel, rather than an oil tanker. The United States Coast Guard conducted an inspection and issued a Certificate of Inspection ("COI") making it lawful for the Juneau to operate as a freight vessel for this single trip. In addition to a COI, United States Vessels that travel overseas must comply with international requirements. The Juneau needed an International Oil Pollution Prevention Certificate ("IOPP"). There are two types of IOPP certificates: Form A,

3

for ships other than oil tankers, and Form B, for oil tankers. Because Sabine elected to operate the Juneau as a freight vessel, the Coast Guard issued it a Form A.

On October 27, 1998, under the control of Captain Stuart Valentine, the S.S. Juneau started its voyage from Portland, Oregon to Bangladesh. Consistent with the COI, the Juneau's cargo consisted of 113,000 metric tons of wheat. En route to Bangladesh, the Juneau stopped in Singapore to load diesel fuel. This fuel was to be used to run several evacuators which would be used to offload the ship's cargo. When the Juneau arrived in Bangladesh in December, 1998, crew members discovered that diesel fuel had leaked into the cargo deck and contaminated the grain. Approximately 9000 gallons of diesel fuel leaked from the starboard slop tank into the bottom of the cargo tank, saturating about 440 metric tons of the wheat cargo. Delivery of the contaminated wheat was refused by Bangladeshi purchasers. At this point in time, the operators of the S.S. Juneau had to decide what to do with the worthless, contaminated cargo. Bangladesh regulations require contaminated portions of food cargoes to be discharged and destroyed while the vessel is still in port.  This requirement was established because too many vessels were disposing of their waste in Bangladeshi waters. The operators of the Juneau, concerned with the expense and delay in disposing of the contaminated cargo

ashore, decided to leave Bangladesh with the contaminated portion of the wheat still in the cargo tank.

Realizing that the fuel had been absorbed into the wheat, making it impossible for crew members to drain the cargo tank and save the grain, the crew contacted headquarters in Iowa. Captain Valentine revealed the problem and advocated discharging the contaminated wheat directly overboard en route to Singapore. Sabine managers discussed this option directly with Stickle; however the S.S. Juneau was unable to secure the required laborers in Bangladesh to ride with the ship and assist in the planned illegal dumping.

As the Juneau was sailing toward Singapore, Sabine headquarters instructed Port Engineer, Michael Krider, to start negotiations and try to solicit a bid for onshore disposal of the contaminated grain. Stickle spoke with Krider and told him to report all information of prospective bids directly to him. The first initial bid was in the amount of $139,000. Krider informed Stickle of this price. Strickle responded by saying that the bid was too high and that the oil-contaminated grain would be disposed of at sea. Throughout the next month Stickle, Michael Reeve ("Reeve"), and John Karayannides ("Karayannides"), all directors of Sabine, discussed other disposal options. One option discussed was an attempt to introduce water in the cargo deck and create a "slurry" out of the water and

5

contaminated wheat. However it was determined that this option was not feasible because the oil discharge monitoring device ("ODM") was not operational and had not been inspected by the Coast Guard. During January, 1998, Krider informed Stickle of several other bids for off-shore and on-shore disposal. Each time, Stickle responded by saying that the bids were too high and that "they could stick the bid." Finally, after deciding that any legal disposal of the contaminated grain would be too costly, at the instruction of Stickle, Karayannides made arrangements for 15 Bulgarian laborers to join the ship in Singapore and assist in disposing of the contaminated grain illegally into the sea.

Shortly thereafter, Krider and Karayannides started creating a false explanation for the disposal of the contaminated grain. On January 25, 1998, Karayannides called the Seattle Coast Guard and spoke with Lieutenant Jane Wong ("Wong"). Karayannides explained that the fuel had somehow breached the vessels fuel tank and leaked into the cargo tank. He then said that he was trying to figure out how to remove the final "oil residues." At no time did Karayannides ever discuss the real problem, which was the 440 metric tons of contaminated grain. Karayannides inquired about the use of an ODM under 33 C.F.R. § 157.37, the regulation that applies to discharges from oil tankers. Wong responded by saying that the Juneau was certified as a freight vessel and was not inspected as a

6

oil tanker. Wong then explained all the additional steps that needed to be taken before the Juneau could be utilized as an oil tanker under the regulations. Wong further stated that the Juneau did not have a Form B IOPP certificate because it was listed and inspected as a freight vessel. After discussing this information with Wong, Karayannides sent Wong a letter that confirmed their conversation. Wong, believing that Karayannides' letter did not accurately portray their conversation, sent a return letter to Karayannides. In her letter, Wong made clear that before the S.S. Juneau could "return ... to operation as a tank vessel" and discharge any residue pursuant to 33 C.F.R. § 157.37, it "must obtain a new COI authorizing service as a tank vessel" and "must obtain a Form B supplement for the IOPP." It is undisputed that the S.S. Juneau never obtained a new COI or Form B supplement for the IOPP.

On January 30, 1998, before the Juneau was to commence the discharge of the contaminated wheat and fuel into the South China Sea, the Juneau acquired a new Captain, George McKay ("McKay"). When McKay boarded the ship he soon realized that the vessel carried tons of contaminated grain. After McKay spoke with Philip Hitchens (the Juneau's Chief Officer) he learned of the plan to dispose of the contaminated wheat into the sea. The next day the Juneau set sail from Singapore en route to Portland. For the next 6 days laborers used evacuators to

7

suck up the contaminated grain from the cargo tank and discharge it overboard into the South China Sea. When the grain was too dense to fit through the evacuators the laborers hauled the contaminated grain up to the deck using a manual bucket and pulley system. In daily correspondences with headquarters in Iowa, McKay discussed the progress of the illegal dumping. It is undisputed that the Juneau did not utilize a certified ODM when discharging this grain into the sea. After all of the contaminated grain was dumped overboard, the cargo tank was flushed and discharged into the ocean.

The Juneau arrived in Portland on March 5, 1999. Shortly thereafter, Hitchens and other crew members learned that the Coast Guard was coming to inspect the vessel. Over the next couple of months the Coast Guard interviewed Juneau crew members. McKay, Hitchens and other crew members sought to minimize the effect of the contamination by falsely stating that the grain was contaminated by sea water rather than diesel fuel. Based upon these initial interviews, the Coast Guard opened a criminal investigation. In April 1999, the Federal Bureau of Investigation("FBI") joined the investigation. The FBI interviewed Hitchens in West Palm Beach, which is located in the Southern District of Florida. During that interview, Hitchens lied to the FBI agents by stating that there "were only traces" of oil in the contaminated grain. Hitchens

sought to minimize the extent of the contamination of the grain which was discharged from the Juneau and to coverup the deliberate unlawful pollution. Immediately following the interview, Hitchens called Sabine headquarters to report the discussion.

Ultimately, on May 27, 1999, Sabine sent a letter to the Coast Guard responding to the criminal investigation. The letter stated, "If the environmental statutes were in fact violated, the violation occurred without the knowledge, authorization, or consent of the shore based management of the company." This letter was sent even though Sabine management knew the statement was false.

## II. Issues

Stickle raises four issues:

1.      Whether the indictment properly charged him with violating 33 C.F.R. § 151.10(a), by knowingly discharging diesel-contaminated wheat and fuel from the Juneau, a freight vessel, into the South China Sea without any discharging monitoring prevention device.

2.      Does the government need to prove venue by a preponderance of the evidence or beyond a reasonable doubt?

3.      Was the evidence that a co-conspirator made a false statement to an

9

FBI agent sufficient to establish venue in the Southern District of Florida for count I of the indictment?

4.  Whether the government established venue under 18 U.S.C. § 3238 for count II of the indictment in the Southern District of Florida, the district of the last known residence of one of the joint offenders, where the offense was committed upon the high seas.

## III. Standard of Review

This court reviews the denial of a motion for a judgment of acquittal as well as the sufficiency of the evidence to support a jury's verdict *de novo*. See United States v. Pistone, 177 F.3d 957, 958 (11th Cir. 1999). When venue is challenged, this court views the evidence in the light most favorable to the government and makes all reasonable inferences and credibility choices in favor of the jury verdict. United States v. Breitweiser, 357 F.3d 1249, 1253 (11th Cir. 2004). A district court's denial of a motion for improper venue is a question of law and subject to *de novo* review. See United States v. Muench, 153 F.3d 1298, 1300 (11th Cir. 1998).

## IV. Analysis

Before we address the merits of this appeal, we turn our attention to the difference between the regulatory provisions that address freight vessels and those controlling oil tankers. According to Federal Regulations, the United States Coast Guard has several provisions which deal with navigation and navigable waters. Most of these provisions were created to protect the ocean environment from oil tankers that were discharging considerable amounts of oil into the sea without the use of a discharging monitoring system. Understanding that oil tankers travel for months across the ocean with a significant amount of oil, the Coast Guard created regulations which allowed certain amounts of oil to be legally discharged into the sea through an oil discharging monitoring system. This device is termed an ODM. In order to utilized these provisions, a vessel must comply with several requirements: (1) a vessel must be certified by the Coast Guard as a oil tanker, (2) the Coast Guard must inspect the vessels ODM to see if the device is functioning properly, and (3) when traveling in foreign waters, a vessel must receive an Intentional Oil Prevention Form B Certificate, which is specifically designed for oil tankers.

However, if a vessel is to be used as a freight vessel, which includes any vessel not an oil tanker, certification is different. A freight vessel must be inspected and certified by the Coast Guard; however, a properly functioning ODM

is not required. Freight vessels are not allowed to utilize oil tanker devices for discharging substances into the sea. In addition, a freight vessel would receive a Form A IOPP, which is for vessels other then oil tankers. There are totally different requirements when utilizing a ship as a freight vessel compared to an oil tanker. With this in mind, we address the merits of the case.

Taking the issues raised in sequence, Stickle first contends that the indictment should be dismissed because one of the regulatory provisions cited in count II, 33 C.F.R. § 151.10(a),[1] applicable to "a ship other than an oil tanker" did not clearly apply to the S.S. Juneau. Stickle asserts that the S.S. Juneau was originally constructed as an oil tanker and therefore can utilize 33 C.F.R. § 157.37 when discharging oil into the sea. This assertion fails for several reasons. First, it is undisputed that the S.S. Juneau was certified, inspected and approved for use as a freight vessel. According to the record, the United States Coast Guard inspected and certified the S.S. Juneau as a freight vessel for a single trip to deliver wheat. Sabine received a COI from the Coast Guard making it clear that the Juneau could only operate as a freight vessel, not an oil tanker. In addition, in order for the

---

[1] § 151.10 Control of oil discharges.
(a) When more than 12 nautical miles from the nearest land, any discharge of oil or oily mixtures into the sea from a ship other than an oil tanker or from machinery space bilges of an oil tanker is prohibited except when all of the following conditions are satisfied. 33 C.F.R. § 151.10(a)(2006).

Juneau to travel in International waters, the vessel needed an IOPP certificate. As mentioned earlier, there are two different types of IOPP certificates, Form A, for ships other than oil tankers, and Form B for oil tankers. The S.S. Juneau received a Form A certificate. During a Form A inspection there is no inspection of an ODM because the vessel is not being certified as an oil tanker. If Stickle wanted to use the Juneau as an oil tanker, the vessel was required to go through the process of inspections and certifications that control the operations of a vessel as an oil tanker, which includes a Form B certificate. A Form B certificate is only granted after passing an inspection of a properly working oil discharging monitoring system. In addition, regardless of whether a vessel is designed as a freight vessel or as an oil tanker, it is clear that a ship cannot discharge any oily mixture or residue into the sea without the use of a properly certified monitoring device. It is clear from the testimony of several crew members that the S.S. Juneau did not use any monitoring device when dumping 440 metric tons of contaminated grain into the South China Sea. The government properly charged Stickle with violating 33 C.F.R. § 151.10(a) because the S.S. Juneau was being operated as a freight vessel and discharged over 440 metric tons of contaminated wheat into the South China Sea without the use of a properly certified monitoring device.

Next, Stickle contends that his convictions on counts I and II must be

reversed because the district court violated his due process rights when it instructed the jury that the government need only prove venue by a preponderance of the evidence. This argument lacks merit. It has long been settled that when the government is proving a non-essential element of a crime, like venue, the prosecution is not required to meet the reasonable doubt standard. See United States v. White, 611 F.2d 531, 534 (5th Cir. 1980) (quoting United States v. Turner, 586 F.2d 395, 397 (5th Cir. 1978).[2] Our precedent is well established and clear as illustrated by this quote from a recent opinion:

> The standard this court applies when venue is challenged is whether, viewing the evidence in the light most favorable to the government and making all reasonable inferences and credibility choices in favor of the jury verdict . . . the Government proved by a preponderance of the evidence that the crimes occurred in the district in the which the defendant was prosecuted.

See United States v. Breitweiser, 357 F.3d 1249, 1253 (11th Cir. 2004). That burden was properly described to the jury.

Third, Stickle argues that there was insufficient evidence to establish venue in the Southern District of Florida for the conspiracy count of the indictment. He contends that all of the overt acts of this conspiracy occurred on the high seas

---

[2] This court adopted the former Fifth Circuit's case law handed down as of September 30, 1981. See Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

14

and/or in Cedar Rapids Iowa.[3] Although Stickle is correct that most of the overt acts occurred on the high seas and in Iowa, it is also true that a false statement was made by one of the co-conspirators in West Palm Beach. This false statement was a deliberate attempt to hinder the criminal investigation and clearly made in furtherance of the objectives of the conspiracy. In April 1999, the FBI interviewed Philip Hitchens, the Juneau's Chief Officer. In this interview, Hitchens lied to the FBI agents by stating that there "were only traces" of oil in the contaminated grain. Hitchens made this false statement in order to minimize the extent of contamination of the grain which was discharged from the Juneau. Based on the totality of the evidence, the jury reasonably concluded that the false statement made by Hitchens impeded the investigation into whether the Juneau's and Sabine's operations had violated the law. Sufficient evidence was presented that an overt act occurred in the Southern District of Florida.

Finally, Stickle asserts that venue did not exist under 18 U.S.C. § 3238 in the Southern District of Florida for count II, the illegal discharge of contaminated grain. The indictment charged Stickle with knowingly discharging and causing to be discharged from a ship more than 400 gross tons of oil and oil mixture of

---

[3]However, despite the fact the charges could have been brought in Iowa, they were properly filed in the Southern District of Florida since there was no existing case in Iowa. See United States v. Williams, 589 F.2d 210 (5th Cir. 1979).

15

diesel-contaminated wheat and diesel fuel, into the sea without the use of an oil discharge monitoring and control system. Pursuant to 18 U.S.C. § 3238, Congress has provided that venue lies:

> [I]n the district in which the offender, or any one of two or more joint offenders, is arrested or is first brought; but if such offender or offenders are not so arrested or brought into any district, an indictment or information may be filed in the district of the last known residence of the offender or any one of two or more joint offenders.

18 U.S.C. § 3238 (2006). The *locus delicti*, or the place where an offense was committed, "must be determined from the nature of the crime alleged and the location of the act or acts constituting it." See <u>United States v. Cabrales</u>, 524 1, 6-7 (1998)(internal quotation marks and citation omitted). Here, it is evident that the *locus delicti* of count II is the high seas. The evidence presented at trial clearly established that the laborers of the S.S. Juneau illegally discharged more than 440 metric tons of contaminated grain in to the South China Sea. Since no offender was arrested or brought into any other district, this court looks to the last known residence of any offender. Here, the last known residence of one of the joint offenders was Hitchens, who lived in the Southern District of Florida. The jury was justified in finding that the government established venue in the Southern District of Florida for count II.

## V. Conclusion

There is simply no merit in the contentions made in this appeal. The government properly charged Stickle with violating 33 C.F.R. § 151.10(a), because the S.S. Juneau was certified as a freight vessel and laborers of the vessel illegally discharged more than 440 metric tons of contaminated grain into the sea. This was done at the direction of Stickle.  Next, when proving a non-essential element of a crime, like venue, the government need only meet the preponderance of evidence standard. Third, venue is appropriate in the Southern District of Florida because a co-conspirator made a false statement in that district which was determined by the jury to hinder the criminal investigation. Finally, the jury was justified in finding that the government established venue in the Southern District of Florida for count II, because under the provisions of  18 U.S.C. § 3238, the criminal activity  occurred on the high seas and the last known residence of Hitchens, a co-conspirator, was in the Southern District of Florida.

AFFIRMED.