[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 20, 2012
JOHN LEY
CLERK

No. 10-15928

_____

D. C. Docket No. 0:10-cr-60158-WPD-4

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

HUGO PENA,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(June 20, 2012)

Before DUBINA, Chief Judge, ANDERSON and KLEINFELD,[*] Circuit Judges.

ANDERSON, Circuit Judge:

---

[*] Honorable Andrew J. Kleinfeld, United States Circuit Judge for the Ninth Circuit, sitting by designation.

This case presents an issue of first impression in this Circuit and, to the best of our knowledge, in the country. We are asked to determine whether the United States has jurisdiction to prosecute a nominated surveyor—i.e., a person who conducts a MARPOL survey on behalf of a foreign nation—for knowingly violating the MARPOL treaty while aboard a foreign vessel docked in the United States.[1] Defendant Hugo Pena argues that under MARPOL it is the responsibility of the Flag State to conduct surveys and issue certificates, and therefore only the Flag State has jurisdiction to prosecute a surveyor for failure to conduct a proper MARPOL survey. We disagree. After thorough review of the relevant treaty and U.S. law, we hold that the United States has jurisdiction to prosecute surveyors for MARPOL violations committed in U.S. ports. Furthermore, under our lenient standards of review for issues raised for the first time on appeal, we find no reversible error in the indictment or jury instructions. Finally, we affirm the district court's denial of judgment of acquittal. Accordingly, we affirm Pena's conviction.

---

[1] Thorough research reveals no case law, in this Circuit or any other federal court, in which 33 U.S.C. § 1908(a) has been applied to prosecute a surveyor. Instead, § 1908(a) has been used to prosecute owners, operators, and/or engineers of foreign-flagged vessels for violating MARPOL by failing to maintain an accurate oil record book. See, e.g., United States v. Ionia Mgmt. S.A., 555 F.3d 303 (2d Cir. 2009); United States v. Jho, 534 F.3d 398 (5th Cir. 2008); United States v. Abrogar, 459 F.3d 430 (3d Cir. 2006); United States v. Petraia Mar., Ltd., 483 F. Supp. 2d 34 (D. Me. 2007). Section 1908(a) has also been used to prosecute alleged dumping violations from U.S.–flagged ships. See, e.g., United States v. Apex Oil Co., 132 F.3d 1287, 1288 (9th Cir. 1997); United States v. Stickle, 355 F. Supp. 2d 1317 (S.D. Fla. 2004), aff'd, 454 F.3d 1265 (11th Cir. 2006).

## I. BACKGROUND

A. <u>Background Law</u>

MARPOL is the common name for the International Convention for the Prevention of Pollution from Ships, Nov. 2, 1973, as modified by the Protocol of 1978, <u>opened for signature</u> Feb. 17, 1978. 1340 U.N.T.S. 62 [hereinafter MARPOL]. This multilateral maritime treaty aims "to achieve the complete elimination of intentional pollution of the marine environment by oil and other harmful substances and the minimization of accidental discharge of such substances." <u>Id.</u> at 184. MARPOL is not a self-executing treaty; instead, each party agrees to "give effect" to it by establishing rules for ships that fly its flag, certifying that such ships comply with the treaty rules, and sanctioning those ships that violate the treaty. MARPOL arts. 1(1), 4(1), 5(1); <u>see</u> <u>United States v. Ionia Mgmt. S.A.</u>, 555 F.3d 303, 307 (2d Cir. 2009). As relevant to this case, both the United States and the Republic of Panama are signatories to the treaty. The Act to Prevent Pollution from Ships ("APPS"), 33 U.S.C. § 1901 <u>et seq.</u>, implements MARPOL and authorizes the U.S. Coast Guard to issue regulations implementing the requirements of the treaty. <u>See</u> 33 U.S.C. § 1903(c)(1); 33 C.F.R. § 151.01 <u>et seq.</u>

Annex I to MARPOL sets forth regulations for the prevention of pollution by

oil from ships. Annex I prohibits a ship from dumping its bilge water[2] into the ocean unless the oil content of that water has been reduced to less than 15 parts per million ("ppm"). Reg. 15.2, Resolution MEPC.117(52), Amendments to the Annex of the Protocol of 1978 Relating to the International Convention for the Prevention of Pollution from Ships, 1973, Oct. 15, 2004 (entered into force Jan. 1, 2007) [hereinafter Annex I]. To reduce the oil content to permissible levels, the bilge water must be pumped through a piece of equipment that filters the oil out of the water, commonly called an "oily water separator." See id. reg. 14.6. Annex I requires all ships of 400 gross tonnage and above to have a functioning oily water separator and to use it to filter the bilge water before it is discharged into the ocean. Id. regs. 14.1, 15.2. If a ship's bilge water is not filtered through an oily water separator to reduce the oil content to permissible levels, then the bilge water must be collected and retained in tanks on the ship and discharged at a proper facility once the ship arrives in port. Id. reg. 15.9.

It is the responsibility of the "Flag State" to certify that ships sailing under its authority (or "flag") comply with international laws such as MARPOL. Id. regs.

---

[2] "Bilge water" is the mixture of oil and water that accumulates in the "bilge"—or bottom—of a ship. All of the oil, fuel and other liquids that drip or leak from machinery during the ship's normal operation, and any seawater that leaks into the ship, ultimately flow downward into the bilge. A ship must periodically discharge that bilge water so that it does not rise to a level where it endangers the safety of the vessel and its crew.

6.3.1, 6.3.4.  With respect to the prevention of oil pollution, the Flag State conducts

an inspection, or "survey," and certifies the ship's compliance by issuing an

International Oil Pollution Prevention ("IOPP") Certificate.  Id. regs. 6.1, 6.3.1, 7.

The Flag State may delegate the authority to conduct the survey and to issue

the IOPP Certificate to a recognized "classification society," which is an

organization that inspects the vessels and issues the certificates on the Flag State's

behalf.  Id. reg. 6.3.1.  The person employed by the classification society to conduct

the survey and issue the certificate on behalf of the Flag State is known as a

"surveyor."  Id.

A surveyor nominated by a foreign nation has the following duties under

MARPOL.[3]  First, when conducting an "initial survey" of a ship, he shall conduct a

complete survey of the structure and equipment "such as to ensure that the

structure, equipment, systems, fittings, arrangements and material fully comply

with the applicable requirements" of Annex I.  Id. reg. 6.1.1.  Similarly, when

conducting a "renewal survey," he shall "ensure that the structure, equipment,

systems, fittings, arrangements and material fully comply with the applicable

requirements" of Annex I.  Id. reg. 6.1.2.  After conducting an initial or renewal

survey in accordance with the provisions of Regulation 6, the surveyor shall issue

---

[3]     This is not an exclusive list of the surveyor's duties under MARPOL.

or endorse an IOPP Certificate. Id. reg. 7. When the nominated surveyor determines that the condition of the ship does not correspond to the IOPP Certificate or is not fit to go to sea, he shall immediately ensure that corrective action is taken and shall in due course notify the Flag State. Id. reg. 6.3.3. If corrective action is not taken, he shall withdraw the IOPP Certificate and notify the Flag State as well as the authorities of the Port State. Id. Upon receiving, from the master or owner of a ship, a report of an accident or defect, the nominated surveyor shall investigate to determine if a survey is necessary and shall ascertain that the master or owner has also reported to the appropriate authorities of the Port State. Id. reg. 6.4.3.

The IOPP Certificate must be maintained by the ship's master on board the vessel. See MARPOL art. 5(2). If a ship does not have a valid IOPP Certificate on board, it is not permitted to set sail or enter the ports of other signatory nations. See id.

"Port States"—nations visited by commercial ships—may inspect the vessels entering their waters and ports to ensure compliance with MARPOL regulations. Id. arts. 5(2), 6(2). An inspection of a foreign vessel by a Port State is called a "port state control examination." In the United States, the Coast Guard is charged with conducting port state control examinations to ensure that all commercial

6

vessels entering the United States comply with MARPOL.  33 C.F.R. § 151.23.

B. Factual and Procedural History

On May 4, 2010, the Coast Guard conducted an unannounced port state control examination of the motor vessel Island Express I ("Island Express"), which was docked at a port just south of Fort Lauderdale, Florida.  The ship was in the process of changing its flag from St. Kitts and Nevis to Panama.  The Coast Guard inspected the ship's documents, including its IOPP Certificate.  The IOPP Certificate, dated April 15, 2010, stated that it was issued in Fort Lauderdale, Florida, by the classification society Universal Shipping Bureau on behalf of the Republic of Panama.  Hugo Pena was the "attending surveyor" who conducted the April 15, 2010, survey and signed the IOPP Certificate.

As stated on the top of the Certificate itself, Pena issued the IOPP Certificate "under the provisions of" MARPOL.  On the first page of the IOPP Certificate, Pena expressly certified: (1) that the ship had been surveyed in accordance with Regulation 4[4] of Annex I of MARPOL; and (2) that the survey showed that the structure, equipment, systems, fittings, arrangement, and material of the ship and

---

[4]    The IOPP Certificate aboard the ship referenced the pre-2007 numbering of Annex I's regulations.  The current regulation governing surveys is Regulation 6.

the condition thereof were in all respects satisfactory and that the ship complied with the applicable requirements of Annex I. Pena further certified that the Island Express was equipped with "[o]il filtering (15 ppm) equipment with alarm and automatic stopping device." Finally, Pena certified that the IOPP Certificate was "correct in all respects." Pena did not note any conditions or deficiencies on the IOPP Certificate indicating any violations on the Island Express.

Upon further inspection, the Coast Guard examiner discovered that the oily water separator did not operate at all and that the ship did not have a bilge holding tank for storing its bilge water for later disposal at a port facility. Instead, the ship had a makeshift system of pumps and rubber tubes designed to pump oily waste from the ship's bilge directly up to the main deck of the ship, where it could flow overboard into the ocean. Although this system of portable pumps and tubes was not part of the ship's standard equipment or an approved modification, Pena made no mention of the pumps and tubing in the IOPP Certificate that he had issued just nineteen days earlier. Furthermore, Pena had not attached any conditions to the IOPP Certificate requiring the repair of the oily water separator or the proper management of the ship's bilge water.

When questioned by the Coast Guard examiners, Pena admitted that he had not tested the oily water separator when he conducted the April 15 survey because

8

the ship's chief engineer had told him that it did not work. Pena further admitted that he had authorized the chief engineer to place portable pumps in the bilge and pump bilge water directly overboard, but only in an emergency. Finally, he acknowledged that the only condition he had issued for the Island Express was for an unrelated crack in the forward bulkhead.

Pena was indicted for: (1) conspiring with the owner and operators of the Island Express to knowingly fail to maintain an accurate oil record book on board the vessel, in violation of 33 U.S.C. § 1908(a), 33 C.F.R. § 151.25, and MARPOL, Annex I, Regulation 17 ("Count 1"); (2) knowingly violating MARPOL by failing to conduct a complete survey of the Island Express, in violation of 33 U.S.C. § 1908(a) and MARPOL, Annex 1, Regulation 6 ("Count 27"); and (3) in a matter within the jurisdiction of the United States Coast Guard, knowingly and willfully making a materially false, fictitious, and fraudulent statement, by certifying that the structure, equipment, systems, fittings, arrangements, and material of the Island Express and its condition were in compliance with Annex I of MARPOL, in violation of 18 U.S.C. § 1001(a)(2) ("Count 28").

At trial, the district court granted Pena's motion for judgment of acquittal on the conspiracy count but denied the motion as to Counts 27 and 28. The jury found Pena guilty of Counts 27 and 28, and the district court sentenced Pena to a term of

five years' probation. Pena now appeals that conviction, arguing: (1) that the United States lacks jurisdiction to prosecute Pena for failure to conduct a MARPOL survey of a Panamanian-flagged vessel; (2) that there is no crime under U.S. law for knowingly violating MARPOL by failing to conduct a complete survey of a vessel, because there is no legal duty to do so; (3) that Count 27 of the indictment was fundamentally defective because it failed to allege that Pena had a legal duty to conduct a MARPOL survey; (4) that the district court's jury instructions pertaining to Count 27 amounted to plain error; (5) that the district court should have granted Pena's motion for judgment of acquittal on Count 27; and (6) that the district court should have granted his motion for judgment of acquittal on Count 28.

## II. DISCUSSION

A. <u>Jurisdiction</u>[5]

Pena argues that under MARPOL it is the responsibility of the Flag State to conduct surveys and to issue IOPP Certificates, and therefore only the Flag State has jurisdiction to prosecute a surveyor for failure to conduct a proper MARPOL

---

[5]    We review jurisdictional issues <u>de novo</u>. <u>United States v. Lopez</u>, 562 F.3d 1309, 1311 (11th Cir. 2009).

survey. According to Pena's argument, Panama had sole jurisdiction to prosecute Pena because the Island Express was a Panamanian-flagged vessel, and therefore, the United States had no jurisdiction to prosecute Pena for failing to conduct a complete MARPOL survey of the Island Express. We disagree.

"[D]istrict courts . . . have original jurisdiction . . . [over] all offenses against the laws of the United States." 18 U.S.C. § 3231. Where the Government charges a defendant with an offense against the laws of the United States, the district court has authority to adjudicate whether the defendant violated that law, unless there is a separate limit on subject matter jurisdiction. United States v. De La Garza, 516 F.3d 1266, 1271 (11th Cir. 2008). "Congress . . . can create additional statutory hurdles to a court's subject matter jurisdiction through separate jurisdictional provisions found in the substantive criminal statute itself under which a case is being prosecuted." Unites States v. Tinoco, 304 F.3d 1088, 1104 n.18 (11th Cir. 2002).

The Government charged Pena with an offense against a law of the United States. Specifically, Pena was charged with a violation of the APPS, 33 U.S.C. § 1908(a), which provides: "A person who knowingly violates the MARPOL Protocol, . . . [the APPS], or the regulations issued thereunder commits a class D felony." 33 U.S.C. § 1908(a). Thus, the district court had jurisdiction to adjudicate

11

the offense unless there was a separate limit on subject matter jurisdiction.

Congress created two express limitations to the application of the APPS. First, the APPS and its implementing regulations apply to violations of MARPOL occurring on foreign-flagged ships only "while [the ships are] in the navigable waters of the United States."  33 U.S.C. § 1902(a)(2); see Ionia Mgmt., 555 F.3d at 307; United States v. Abrogar, 459 F.3d 430, 435 (3d Cir. 2006) (finding that "under the APPS and accompanying regulations, Congress and the Coast Guard created criminal liability for foreign vessels and personnel only for those substantive violations of MARPOL that occur in U.S. ports or waters").  It is undisputed that the conduct at issue in this case occurred at a port in Florida.  Thus, the first limitation provides no bar to jurisdiction in this case.  The second limitation imposed by Congress is that "[a]ny action taken under [the APPS] shall be taken in accordance with international law."  33 U.S.C. § 1912.  As we explain below, the U.S. government's jurisdiction to prosecute violations of domestic law committed in U.S. ports is in accordance with well-established international law. See United States v. Jho, 534 F.3d 398, 409 (5th Cir. 2008) ("Neither [the United Nations Convention on the Law of the Seas] nor the law of the flag doctrine encroaches on the well-settled rule that a sovereign may exercise jurisdiction to prosecute violations of its criminal laws committed in its ports.").

12

A foreign commercial ship at a U.S. port is subject to the jurisdiction of the United States. Mali v. Keeper of the Common Jail, 120 U.S. 1, 11, 7 S. Ct. 385, 387 (1887); see Cunard S.S. Co. v. Mellon, 262 U.S. 100, 122, 43 S. Ct. 504, 507 (1923) (noting that it is "settled in the United States and recognized elsewhere that the territory subject to its jurisdiction includes . . . the ports"). "The jurisdiction of the nation within its own territory is necessarily exclusive and absolute." Cunard, 262 U.S. at 124, 43 S. Ct. at 507 (quotation omitted). "All exceptions, therefore, to the full and complete power of a nation within its own territories, must be traced up to the consent of the nation itself." Id., 43 S. Ct. at 508 (quotation omitted). The United States "may out of considerations of public policy choose to forego the exertion of its jurisdiction or to exert the same in only a limited way, but this is a matter resting solely within its discretion." Id., 43 S. Ct. at 507. Thus, the United States "has exclusive jurisdiction to punish offenses against its law committed within its borders, unless it expressly or impliedly consents to surrender its jurisdiction." Wilson v. Girard, 354 U.S. 525, 529, 77 S. Ct. 1409, 1412 (1957) (per curiam).

Jurisdiction over foreign vessels in port is frequently limited by treaty agreement. Restatement (Third) of Foreign Relations Law § 512 cmt. 5 (1987); see Mali, 120 U.S. at 11, 7 S. Ct. at 387 (noting that it is "part of the law of civilized

nations that, when a merchant vessel of one country enters the ports of another for the purposes of trade, it subjects itself to the law of the place to which it goes, unless, by treaty or otherwise, the two countries have come to some different understanding or agreement"). Article 4 of the MARPOL Convention makes clear that, for violations that occur within the jurisdiction of the Port State, the Port State and the Flag State have concurrent jurisdiction. Article 4(1) provides: "Any violation of the requirements of the present Convention shall be prohibited and sanctions shall be established therefor under the law of the Administration[6] of the ship concerned wherever the violation occurs." 1340 U.N.T.S. at 185. Article 4(2) of the Convention provides:

> Any violation of the requirements of the present Convention within the jurisdiction of any Party to the Convention shall be prohibited and sanctions shall be established therefor under the law of that Party. Whenever such a violation occurs, that Party shall either: (a) Cause proceedings to be taken in accordance with its laws; or (b) Furnish to the Administration of the ship such information and evidence as may be in its possession that a violation has occurred.

Id. at 186. Therefore, by signing the MARPOL treaty, the United States consented to surrender its exclusive jurisdiction over violations within its ports, but it still maintained concurrent jurisdiction to sanction violations of the treaty according to U.S. law.

---

[6] MARPOL uses the term "Administration" to refer to the Flag State.

14

33 U.S.C. § 1907(a) and (b) of the APPS essentially codify the provisions of Articles 4(1) and 4(2), and § 1908(a) establishes the sanctions required in Article 4. Section 1907(a) makes it "unlawful to act in violation of the MARPOL Protocol" and requires the Secretary[7] to "cooperate with other parties to the MARPOL Protocol . . . in the detection of violations and in enforcement of the MARPOL Protocol"; to "use all appropriate and practical measures of detection and environmental monitoring"; and to "establish adequate procedures for reporting violations and accumulating evidence." 33 U.S.C. § 1907(a). Section 1907(b) further provides: "Upon receipt of evidence that a violation has occurred, the Secretary shall cause the matter to be investigated. . . . Upon completion of the investigation, the Secretary shall take the action required by the MARPOL Protocol . . . and whatever further action he considers appropriate under the circumstances." Id. § 1907(b). We find nothing in Article 4 or the APPS that provides express or implied consent to surrender the United States' concurrent jurisdiction over violations of the APPS occurring on foreign ships while docked at U.S. ports. See Wilson, 354 U.S. at 529, 77 S. Ct. at 1412.

Pursuant to Article 4 of MARPOL, the United States shares concurrent

---

[7]     The "Secretary" means the Secretary of the department in which the Coast Guard is operating. 33 U.S.C. § 1901(a)(11).

15

jurisdiction with the Flag State over MARPOL violations occurring on foreign-flagged ships in U.S. ports.  Furthermore, 18 U.S.C. § 3231 and 33 U.S.C. §§ 1907 and 1908 give U.S. district courts jurisdiction over violations of MARPOL committed on foreign-flagged ships in U.S. ports, and Congress has neither explicitly nor implicitly surrendered complete jurisdiction to the Flag State.  Thus, we conclude that the United States had jurisdiction to prosecute Pena, a surveyor of a foreign-flagged ship, for a knowing violation of MARPOL committed on a foreign-flagged ship at a U.S. port.

B. Sufficiency of the Indictment

We review de novo the sufficiency of an indictment.  United States v. Wayerski, 624 F.3d 1342, 1349 (11th Cir. 2010).  Substantively, for an indictment to be sufficient, it must: (1) present the essential elements of the charged offense; (2) provide the accused notice of the charge he must defend against; and (3) enable the accused to rely upon any judgment under the indictment for double jeopardy purposes.  United States v. Woodruff, 296 F.3d 1041, 1046 (11th Cir. 2002).  "In determining whether an indictment is sufficient, we read it as a whole and give it a common sense construction."  United States v. Jordan, 582 F.3d 1239, 1245 (11th Cir. 2009) (per curiam) (quotations omitted).  "A criminal conviction will not be

16

upheld if the indictment upon which it is based does not set forth the essential elements of the offense." United States v. Fern, 155 F.3d 1318, 1324-25 (11th Cir. 1998). "If an indictment specifically refers to the statute on which the charge was based, the reference to the statutory language adequately informs the defendant of the charge." Id. at 1325.

However, when a defendant challenges the adequacy of an indictment for the first time on appeal, "this Court must find the indictment sufficient unless it is so defective that it does not, by any reasonable construction, charge an offense for which the defendant is convicted." United States v. Gray, 260 F.3d 1267, 1282 (11th Cir. 2001) (quotations omitted). Thus, in some instances, an element may be inferred from the express allegations of the indictment. Id. at 1283. "Practical, rather than technical, considerations govern the validity of an indictment. Minor deficiencies that do not prejudice the defendant will not prompt this court to reverse a conviction." United States v. Adams, 83 F.3d 1371, 1375 (11th Cir. 1996) (per curiam) (quotations and alteration omitted). Where the defendant suffers no actual prejudice as a result of the indictment, and the indictment provides facts and the specific statute under which the defendant is charged, the court will find the indictment sufficient. Id.

We readily conclude that Pena suffered no actual prejudice as a result of the

indictment. Pena argues on appeal that Count 27 of the indictment was insufficient because it failed to allege that Pena had a legal duty to conduct a complete survey of the vessel. We disagree. The indictment was sufficient to charge Pena with the offense for which he was convicted, especially in light of our lenient standard of review for sufficiency challenges raised for the first time on appeal. Count 27 alleges that Pena knowingly violated MARPOL by failing to conduct a survey, which necessarily implies that he had a duty to conduct the survey in the first place. Moreover, it is clear from the references to MARPOL and Regulation 6, and from the context revealed by other allegations of the indictment,[8] that Count 27 charges

_____

[8] In general, when the indictment is challenged before the district court, "each count of an indictment must be regarded as if it were a separate indictment and must stand on its own content without dependence for its validity on the allegations of any other count not expressly incorporated." United States v. Schmitz, 634 F.3d 1247, 1261 (11th Cir. 2011) (quotations omitted). However, we hold that where, as here, the sufficiency of the indictment is raised for the first time on appeal, the court can consider the content of other counts of the indictment in order to give context to the challenged count so long as the defendant fails to show actual prejudice resulting from the indictment's failure to expressly incorporate other paragraphs into the challenged count. See Gray, 260 F.3d at 1282-83 (in the context of the court's limited review when the indictment is challenged for the first time on appeal, holding that "an indictment is not defective simply because it fails to allege mens rea [the missing element in Gray] so long as the allegation that the crime was committed with the requisite state of mind may be inferred from other allegations in the indictment"); Adams, 83 F.3d at 1375 (upholding conviction where defendant "suffered no actual prejudice as a result of [the] indictment"); see also United States v. Hagmann, 950 F.2d 175, 183-85 (5th Cir. 1991) (finding indictment sufficient even though the challenged count failed to allege one element of the offense or to incorporate the count where the missing element was alleged, because "judicial efficiency requires that [indictments challenged for the first time on appeal] be construed in favor of validity" and "reindictment and retrial on [the defective counts] here would be a pure waste of energy because [the defendant] would not thereby be afforded any protection of his rights which was not afforded in the first trial") (quotations and alterations omitted); United States v. Zavala, 839 F.2d 523, 526 (9th Cir. 1988) (upholding indictment and noting that the challenged count's failure to specifically refer to a

18

Pena with failing to conduct the survey that is required prior to issuing the IOPP

Certificate.[9]

Pena further argues that Count 27 of the indictment is defective because it

alleged the wrong standard for a survey conducted due to a change of flags under

Annex 1, Regulation 10.9.3. Pena argues that although Count 27 charges him with

---

separate count was "a defect of form, not substance," and that the court "must overlook such a defect where, as here, defendant challenged the indictment for the first time on appeal"). In this case, Pena has shown no actual prejudice resulting from the indictment's failure to incorporate other paragraphs of the indictment into Count 27.

[9]        We also reject Pena's argument that failure to conduct a MARPOL survey is not a crime. Regulation 6.3 and Regulation 7 permit the Flag State to delegate to the nominated surveyor the authority to conduct a MARPOL survey and to issue the IOPP Certificate. Regulation 6.1 and Regulation 7.1 make it clear that the survey is required before the IOPP Certificate required under Regulation 7 is issued, and that any survey "shall be such as to ensure that the structure, equipment, systems, fittings, arrangements and material fully comply" with Annex I. Annex I regs. 6.1.1, 6.1.2. Furthermore, Regulation 7 requires a surveyor—including a nominated surveyor—to issue an IOPP Certificate only after conducting an initial or renewal survey in accordance with the provisions of Regulation 6. Thus, a nominated surveyor has a duty under MARPOL to conduct a MARPOL survey, as described in Regulation 6.1, prior to issuing an IOPP Certificate, and a knowing failure to conduct the required survey is a violation of MARPOL and a class D felony under the APPS. See 33 U.S.C. 1908(a).

We note that the indictment should have mentioned specifically—in Count 27 without requiring reference to the context revealed by other allegations—Pena's issuance of the IOPP Certificate without first conducting the survey and ensuring that the ship fully complied with MARPOL, as required under Regulation 6.1 and Regulation 7. However, under our lenient standard of review for challenges to the indictment raised for the first time on appeal, we can infer—from the context revealed by other allegations, from Count 27's specific mention of Regulation 6, and from Count 27's description (tracking the language of Regulation 6.1) of the survey required prior to issuing an IOPP Certificate—that Pena was charged with failing to conduct the MARPOL survey despite issuing the IOPP Certificate. See Gray, 260 F.3d at 1282-83 (in the context of the court's limited review when the indictment is challenged for the first time on appeal, holding that "an indictment is not defective simply because it fails to allege mens rea [the missing element in Gray] so long as the allegation that the crime was committed with the requisite state of mind may be inferred from other allegations in the indictment").

19

failure to conduct a "complete survey . . . such as to ensure that the structure, systems, arrangements, and material of the ship fully complied with MARPOL," such a survey is only required for the initial MARPOL survey. He contends that, for a change of flags, Regulation 10.9.3 requires only compliance with Regulations 6.4.1 and 6.4.2, which do not require a complete survey.

We find Pena's argument wholly without merit. The owner of the vessel was in the process of changing its flag to that of Panama. In such circumstance, Regulation 10.9.3 provides that the prior certification ceases to be valid, that a "new certificate" has to be issued, and that before issuing the new certificate the Flag State must be fully satisfied "that the ship is in compliance with the requirements of [R]egulations 6.4.1 and 6.4.2 of this Annex." Annex I reg. 10.9.3. Because the original IOPP Certificate becomes invalid upon the re-flagging of a ship, a new IOPP Certificate must be issued. Regulation 7 prescribes the requirements for the issuance of an IOPP Certificate. Therefore, a surveyor issuing a new certificate upon the re-flagging of a ship must comply with Regulation 7, in addition to Regulations 6.4.1 and 6.4.2.

Regulation 7.1 provides that an IOPP Certificate shall be issued "after an initial or renewal survey in accordance with the provisions of [R]egulation 6 of this Annex." Id. reg. 7.1. In other words, Regulation 7 expressly provides that any

20

certificate—therefore including the new certificate required by Regulation 10.9.3 upon re-flagging—may only be issued after either an initial or a renewal survey in accordance with Regulation 6. Thus, a surveyor must conduct either an initial or a renewal survey prior to issuing a new IOPP Certificate to a newly-flagged ship. Either type of survey "shall be such as to ensure that the structure, equipment, systems, fittings, arrangements and material fully comply with the applicable requirements of this Annex." Id. regs. 6.1.1, 6.1.2. Therefore, prior to issuing an IOPP Certificate to a re-flagged vessel, a surveyor must conduct a survey that is "such as to ensure that the structure, equipment, systems, fittings, arrangements and material fully comply with the applicable requirements" of Annex I of MARPOL. Id. This, of course, is the precise language of Count 27 (which tracked the language of Regulations 6.1.1 and 6.1.2). Thus, Pena's argument that Count 27 is defective is wholly without merit.

Although we believe that the above interpretation is the most plausible construction of the regulations, because of our lenient standard of review we are not required to definitively establish the precise interpretation of Regulation 10.9.3 in this case. For the reasons that follow, even if Regulation 10.9.3 were construed as requiring compliance with only Regulations 6.4.1 and 6.4.2, under the narrow language of those regulations, the indictment would not be "so defective that it

21

does not, by any reasonable construction, charge an offense for which the defendant is convicted." Gray, 260 F.3d at 1282.

Regulation 10.9.3 provides, in pertinent part:

A certificate issued under [R]egulation 7 . . . shall cease to be valid . . . upon transfer of the ship to the flag of another State. A new certificate shall only be issued when the Government issuing the new certificate is fully satisfied that the ship is in compliance with the requirements of [R]egulations 6.4.1 and 6.4.2 of this Annex.

Annex I reg. 10.9.3 (emphasis added). Regulation 6.4.1 provides:

The condition of the ship and its equipment shall be maintained to conform with the provisions of the present Convention to ensure that the ship in all respects will remain fit to proceed to sea without presenting an unreasonable threat of harm to the marine environment.

Thus, a nominated surveyor—who issues the IOPP Certificate on behalf of "the Government issuing the new certificate"—must be "fully satisfied," id. reg. 10.9.3, that "the ship and its equipment . . . conform with the provisions of [Annex I] to ensure that the ship in all respects will remain fit to proceed to sea without presenting an unreasonable threat of harm to the marine environment," id. reg. 6.4.1. Under MARPOL, the only way for a surveyor to be "fully satisfied" that the ship conforms with the provisions of Annex I is to conduct a survey as described in Regulation 6.1.

Indeed, this is even clearer from Regulation 6.4.2, the requirements of which

22

also must be met under the narrow language of Regulation 10.9.3. Regulation 6.4.2 specifically references the survey described in Regulation 6.1. Regulation 6.4.2 provides:

> After any survey of the ship under paragraph 1 of this regulation has been completed [i.e., the survey described in Regulation 6.1], no change shall be made in the structure, equipment, systems, fittings, arrangements or material covered by the survey, without the sanction of the Administration, except the direct replacement of such equipment and fittings.

Again, the only way to be "fully satisfied" that there has been no change in the "structure, equipment, systems, fittings, arrangements or material" of the re-flagged vessel is to conduct a survey of those parts of the vessel, the very parts required under Regulation 6.1 to be surveyed, and the very parts Pena was charged in the indictment with having failed to survey. In other words, Regulation 10.9.3's reference to Regulation 6.4.2, which in turn references Regulation 6.1, indicates that a survey in compliance with Regulation 6.1 must be performed upon the re-flagging of a ship. Thus, even if the narrow language of Regulation 10.9.3—independent of Regulation 7—solely governs the issuance of an IOPP Certificate upon the re-flagging of a vessel, the survey requirements of Regulation 6 must still be performed prior to issuing the IOPP Certificate.

Because Pena did not challenge the indictment prior to this appeal, we must

find the indictment sufficient "unless it is so defective that it does not, by any reasonable construction, charge an offense for which" Pena was convicted. Gray, 260 F.3d at 1282. Under either reading of the treaty described above—that is, that the re-flagging of a ship is governed by Regulations 10.9.3, 7, and 6; or that the re-flagging is governed only by the narrow language of Regulations 10.9.3, 6.4.1, and 6.4.2—a surveyor is required to conduct a survey of the ship such as to ensure that the ship fully complies with MARPOL. The indictment charged Pena with failing to conduct a survey "such as to ensure that the structure, equipment, systems, arrangements, and material of the ship fully complied with MARPOL, in violation of [33 U.S.C. § 1908(a)] and MARPOL, Annex I, Regulation 6." We readily conclude that, under our lenient standard of review, the indictment was sufficient. See Gray, 260 F.3d at 1282.

   C. Jury Instructions

At trial, Pena made no requests for jury instructions and no objections to the instructions given by the district court. Where the defendant does not request specific instructions and fails to object at trial to the district court's charge for failure to include specific instructions, this Court reviews for plain error. United States v. Solomon, 856 F.2d 1572, 1577 (11th Cir. 1988). Under the plain error

24

standard, an appellant must show that: (1) an error occurred; (2) the error was plain; (3) it affected his substantial rights; and (4) it seriously affected the fairness of the judicial proceedings. United States v. Schultz, 565 F.3d 1353, 1356-57 (11th Cir. 2009) (per curiam). Under the third prong of the plain error analysis, the defendant bears the burden of persuasion and "must show that the claimed error affected his substantial rights, which almost always requires that the error must have affected the outcome of the district court proceedings." United States v. Pantle, 637 F.3d 1172, 1177 (11th Cir. 2011) (per curiam) (quotations omitted), cert. denied, 132 S. Ct. 1091 (2012).

Pena argues on appeal that the district court committed plain error by failing to instruct the jury that they had to find that Pena had a legal duty to conduct a MARPOL survey in order to find him guilty of Count 27. We disagree. Although we doubt there was error at all (and have even greater doubt that there was obvious error), we need address only the third prong. Pena cannot satisfy the third prong of the plain error review because he has not shown that the failure to state specifically that he had a duty to conduct the survey affected his substantial rights—that is, there was no showing that the error affected the outcome of the district court proceedings. See id. As discussed above, Pena's duty was implied in the indictment itself—i.e., the allegation that Pena knowingly violated MARPOL by

25

failing to conduct the required survey necessarily implies a duty to conduct the survey, as does the referenced regulatory scheme.

Pena also argues that the court erred by instructing the jury that a vessel is required to have a comprehensive initial survey when changing flags. However, even if this instruction were error, the error would not be "plain," because—as discussed above—the explicit language of Regulation 10.9.3 does not unambiguously indicate the precise scope of the survey that is required upon re-flagging, and "there is no precedent from the Supreme Court or this Court directly resolving" the issue. United States v. Bernal-Benitez, 594 F.3d 1303, 1313 n.7 (11th Cir. 2010) (quotations omitted). Furthermore, the above discussion also makes clear that Pena cannot satisfy the third prong of the plain error analysis. The above discussion suggests that under any reasonable construction of the regulatory scheme, Pena had a duty to conduct a far more comprehensive survey before issuing the IOPP Certificate than the evidence indicates was actually conducted. We are confident that the outcome was not affected by the instruction that Pena was required to conduct an initial survey, as opposed to a renewal survey or some other survey sufficient to ensure that the "structure, equipment, systems, arrangements and material of the ship fully complied with MARPOL." Thus, we conclude that there was no plain error in the jury instructions as to Count 27.

D. Denial of Judgment of Acquittal on Counts 27 and 28

We review de novo a district court's denial of a motion for judgment of acquittal on sufficiency of evidence grounds. United States v. Browne, 505 F.3d 1229, 1253 (11th Cir. 2007). In the procedural posture of this case, we will review the trial record as a whole, not just the government's case. United States v. Alejandro, 118 F.3d 1518, 1521 (11th Cir. 1997). In doing so, "we consider the evidence in the light most favorable to the Government, drawing all reasonable inferences and credibility choices in the Government's favor." Browne, 505 F.3d at 1253. "It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." United States v. Faust, 456 F.3d 1342, 1345 (11th Cir. 2006) (quotations omitted). "If a reasonable jury could conclude that the evidence establishes guilt beyond a reasonable doubt, we will affirm the verdict." Browne, 505 F.3d at 1253.

There was ample evidence to support the verdict that Pena violated MARPOL by failing to conduct a complete survey as required in Regulation 6 of Annex I. First, he admitted to the Coast Guard that he had not tested the oily water separator because he already knew that the ship's oily water separator was not functional. Nevertheless, he issued the IOPP Certificate with no conditions or deficiencies. Second, there was evidence that he issued two different IOPP

27

Certificates: the Certificate found on the ship certified that the Island Express had oil filtering equipment with an alarm and automatic stopping device, while the Certificate he provided to the company and Flag State certified that there was no alarm or automatic stopping device. From these conflicting Certificates, the jury could reasonably conclude that Pena never inspected the oily water separator and had no idea whether or not the equipment had an alarm or an automatic stopping device.

Furthermore, there was evidence that Pena knew that the ship was leaking excessive amounts of seawater into the bilges of the engine rooms, creating large amounts of bilge water that would need to be managed. There was testimony that the ship did not have sufficient capacity to store its bilge water. Significantly, the evidence demonstrated that the makeshift system of pumps and rubber tubing in the engine room was open and obvious, had been in place for months, and was designed to pump water from the bilge up to the main deck and overboard into the ocean. However, the IOPP Certificate made no mention of the pumps and tubing and placed no conditions on the vessel to ensure that the oily water separator would be fixed and that the bilge water would be properly managed. From this evidence, a reasonable jury could decide beyond a reasonable doubt that Pena knowingly failed to conduct the required survey of the Island Express such as to ensure that

28

the structure, equipment, systems, arrangements, and material of the ship fully complied with MARPOL. Therefore, we affirm the denial of the judgment of acquittal as to Count 27.

Similarly, there was ample evidence to support the verdict as to Count 28. The provisional IOPP Certificate that Pena issued on April 15, 2010, certified to the Coast Guard examiners that the Island Express was in compliance with MARPOL regulations and was capable of lawfully discharging its bilge water, either by filtering it through its oily water separator or storing it in tanks to be discharged at a proper port facility. However, as explained above, there was sufficient evidence for the jury to conclude that Pena willfully certified that the vessel was in compliance with MARPOL even though he knew that statement was false. Accordingly, we affirm the district court's denial of judgment of acquittal.

## CONCLUSION

For the foregoing reasons, we affirm Pena's conviction.

**AFFIRMED.**

29