[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-13651
_____

D.C. Docket No. 1:10-cr-20848-CMA-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

EDDIE TALLEY, JR.,
MARCUS TALLEY,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(April 2, 2014)

Before ANDERSON and GILMAN,* Circuit Judges, and JOHNSON,** District
Judge.

_____

*Honorable Ronald Lee Gilman, United States Circuit Judge for the Sixth Circuit, sitting by
designation.

**Honorable Inge Prytz Johnson, United States District Judge for the Northern District of
Alabama, sitting by designation.

PER CURIAM:

In this two-defendant criminal appeal, Appellants Marcus and Eddie Talley raise thirteen issues between them.  We reject all of them and affirm their convictions and sentences.

The premise of the prosecution was that Appellant Marcus Talley recruited young men to rob banks in order to fund his Urban Guerilla Syndicate ("UGS").  Marcus told the young men that the UGS's objective was to take over the government because African-Americans were not treated right.  Robbing banks would fund the movement; Marcus told the young men that snitches "would get handled," which one of the young men took to mean they would be killed.  Marcus told one of these robbers-turned-witnesses that UGS needed money to hire lawyers, judges, and crooked cops to help UGS members who were arrested. There was substantial evidence of Eddie's participation in the bank robberies – i.e., from the testimony of the three cooperating coconspirators, and from evidence obtained in a search of Eddie's residence ("the Mansion").  Eddie himself also testified.

A search of the Mansion pursuant to a search warrant recovered PVC pipe parts, spools of different colored wires, several magazines and boxes of ammunition for different types of firearms, a loaded handgun, and two gun boxes.  Another search turned up "Fast Orange" hand cleanser, like the type Eddie used to remove dye from Jeffrey St. Louis's hands after the Bank of America robbery.

2

After Marcus was arrested and while he was being held in an interrogation room, he talked to the detective, Robert Lanier, who was "babysitting" him. Marcus told Lanier about his belief that the banks were in control of the United States and how he recruited youths already involved in petty crime to rob the banks. He said he wanted to take over the United States and the way to do that was to take over the banks.

After Marcus's attorney questioned Marcus's competency to stand trial, the Magistrate Judge ordered an evaluation and held an evidentiary hearing. Marcus claimed to be the Messiah and denied the court's jurisdiction at his pretrial detention hearing. The Government filed reports of Dr. Lisa Feldman based on her evaluation and review of his records. Marcus was treated in 1992, when his family had him committed for what Dr. Feldman considered substance-induced psychosis. In 1996, Marcus told several doctors and family members that it was revealed to him that he was the Messiah. He was diagnosed over the next ten years by various psychologists and psychiatrists with paranoid schizophrenia. He was found incompetent in 1998, and in 1999, Dr. James Larson concluded that "[t]he prognosis is for a life-long course of mental illness and gradual deterioration over time." He was released from medical custody in 2007 although Dr. Larson acknowledged at the time that Marcus might not be delusional. Most of the previous explorations of Marcus's mental health had been conducted in the context

of previous criminal charges against Marcus.

Dr. Feldman testified that she performed psychological tests that indicated Marcus suffered from no cognitive impairment and the results were consistent with malingering. She also stated, though, that the symptoms he exhibited were a product of his personality disorder. She challenged the conclusions in the medical history during the 10-year period of diagnosed incompetency, stating that Marcus "appreciates" that maintaining his Messiah stance was his best option for being released. In his 1997 and 2007 evaluations, there were statements that he might be attempting to present himself as being in more psychological distress than he was actually in. She further cited evidence dating back to 1992 indicating that his behavior was due to cocaine use and not mental illness; subsequent evaluations merely re–referenced his behavior without distinguishing its possible causes. Further, she noted that Marcus did not persist in his messianic claims when talking to non-mental health evaluators. She faulted earlier evaluations for failing to address findings that he understood the charges against him. She also cited his recorded conversation with his wife in 2010 where he referred to himself by his proper name and gave cogent instructions on how to assist with his legal defense. Finally, she pointed to his instructions to others to "act crazy" to avoid prison.

At the hearing, police officer Lanier testified that Marcus appeared calm and intelligent and never referred to himself as the Messiah, Jesus Christ, a savior,

4

or a deity.  However, Lanier also testified that he thought that Marcus should be "Baker Acted," meaning involuntarily committed because he was not being rational.  After the hearing, the Magistrate Judge issued a report, finding that Marcus "has a rational as well as factual understanding of the proceedings against him and that he has a sufficient present ability to consult with his attorney within a reasonable degree of rational understanding."

The district court, Judge Jordan, ordered another competency evaluation and held an additional hearing. The new evaluator, Dr. Richard Frederick, wrote that there was no "compelling evidence to support a conclusion that he has ever had any active mental disorder since the time of his original prosecution in 1996/97." Dr. Frederick testified that Marcus's schizophrenia diagnosis could be explained by cocaine use and was never seriously re-examined.  He noted that Marcus's outbursts were nothing remarkable and that he seemed to consult with his lawyer in a cooperative manner.  At the hearing, Marcus stated that the hearing was not necessary and expressed his desire to present the truth about the oppression of African-Americans that led to his understanding that he was the Messiah.  The district court agreed with the Magistrate Judge's report, crediting the new evaluator's testimony that Marcus was malingering and concluding that Marcus was competent.

On March 1, 2012, the case was transferred to Judge Altonaga.  Judge

Jordan's ruling came out two weeks later and Judge Altonaga did not order a new competency ruling. On March 22, Judge Altonaga held a hearing on Marcus's motion for a continuance. At the hearing, Marcus asked to dismiss his attorney and proceed pro se. Defense counsel had advised the court that he thought an insanity defense was warranted but Marcus opposed it, seeking instead to assert a political defense based on the racial caste system, persecution, oppression, and tyranny in the United States. Judge Altonaga therefore held a colloquy pursuant to Faretta v. California, 422 U.S. 806, 95 S. Ct. 2525 (1975), to determine Marcus's ability to represent himself. Marcus referred to himself as the "One" and talked of his current incarnation. But he acknowledged that "the legal personality involved in this particular situation is Marcus Talley." Marcus stated that he had read a great deal (apparently in institutions) and understood that he was accused of robbing banks. He described the government's burden and asked for stand-by counsel's assistance on evidentiary rules. The court advised him that it would be better to use an attorney and explained why, but did not offer substituted appointed counsel. Marcus stated that "no one was willing to accept his defense" and that the attorneys he had met were not willing to use it. The district court found that Marcus knowingly invoked his right to proceed pro se and represent himself. However, the judge also elicited Marcus's assurance that he would use stand-by counsel at appropriate times.

The Talleys proceeded to trial two weeks later and were convicted of all counts.  The district court sentenced Marcus to 384 months' imprisonment, after the court determined that his criminal history was underrepresented due to his having earlier charges dismissed because of mental illness.  The court also gave an obstruction of justice enhancement because she found he was feigning illness at the competency hearing.  The district court enhanced Eddie's sentence for obstructing justice by testifying and proclaiming his innocence, denying facts such as his provision of fake bombs to the participants.  The district court found that Eddie lied on the witness stand, and sentenced Eddie to 269 months' imprisonment.

We first address Eddie's challenges to his conviction and sentence.  Then we address the challenges of Marcus.

## I.    EDDIE TALLEY

*A.  Has Eddie Demonstrated Plain Error as a Result of the Admission Without a Limiting Instruction of Marcus's Confession and Radical Beliefs?*

Eddie argues that he was severely prejudiced when the Government introduced inflammatory evidence relating only to Marcus.  First, he states that Marcus's confession to Detective Lanier was hearsay evidence against him.  He does not argue that Marcus said anything about him in the confession; rather, the confession was that Marcus used misguided young men to rob banks as a means of

7

taking over the United States.  He states that he was entitled to a contemporaneous instruction that the confession was not admissible against him.  He points to prejudice in the form of witnesses testifying that Marcus and Eddie acted in tandem.  He argues that the prejudice was exacerbated by the admission of other evidence related solely to Marcus, in the form of the radical and violent ideology that Marcus espoused.  He asserts this evidence was irrelevant to his own guilt because there was no evidence that Eddie shared Marcus's views.  The challenged evidence was about the UGS, Marcus's initiation of the young men into the group, his threats against snitches, and documents and pamphlets that Marcus produced. Eddie argues the effect was magnified by Marcus's questions during voir dire, when he asked potential jurors if they thought George Washington was a criminal for standing up to tyranny and his description of political prisoners.

The Confrontation Clause of the Sixth Amendment provides a defendant in a criminal trial the right "to be confronted with the witnesses against him" and to cross-examine them.  See Richardson v. Marsh, 481 U.S. 200, 206-07, 107 S. Ct. 1702, 1707 (1987).  This right is violated when a facially incriminating statement of a nontestifying co-defendant is offered into evidence at a joint trial, even if the jury is instructed to consider the statement as evidence only against the defendant who made the statement.  Bruton v. United States, 391 US. 123, 126, 88 S. Ct. 1620, 1622 (1968).  In Richardson, however, the Supreme Court distinguished

8

Bruton when a non-testifying co-defendant's statement did not incriminate the defendant on its face and the statement became incriminating only when linked with other evidence. 481 U.S. at 208–209, 107 S. Ct. at 1707–1708.  In such situations, the jury is deemed to follow limiting instructions that the co-defendant's statement is to be considered by the jury only against the co-defendant and not against this defendant (Eddie here). Id.

Here, there was no limiting instruction, so there is error.  However, Eddie did not object below so we review for plain error.  To prevail under the plain error standard, an appellant must show: (1) an error occurred; (2) the error was plain; (3) it affected his substantial rights; and (4) it seriously affected the fairness of the judicial proceedings. United States v. Pena, 684 F.3d 1137, 1151 (11th Cir. 2012). Because Marcus's confession did not implicate Eddie at all, its mere existence as evidence in the case did not adversely affect Eddie's substantial rights.  However, Eddie argues that the three witnesses/participants had been seriously impeached and that Marcus's confession -- demonstrating that in fact Marcus had done what he was accused of doing -- made their testimony more believable.  We cannot conclude that this adversely affected Eddie's substantial rights.  As the Government points out, the wires and cleanser found at Eddie's house corroborated the three witnesses' stories.  While there were some differences between the participants' stories, all of the things that Eddie points to in his brief as differences

9

are fairly minor.  The three witnesses said almost the same thing, i.e.,  that Eddie gave them the bombs, was involved in the planning, and let them meet at his houses; he also called the police off when the participants were discovered at his uninhabited house.  Finally, the confession had limited probative value against Eddie because it did not implicate him at all.  Given the strength of the evidence against Eddie, Eddie has not shown that his substantial rights were affected.

Turning to the pamphlets, again we review for plain error.  There is no indication that the jury considered the pamphlets against Eddie and the Government put on extensive evidence about Eddie's different motive, namely money.  Therefore, there was no error.[1]

*B. Eddie's Challenge to the Admission of Prior Bad Acts*

Eddie argues that the district court improperly allowed in evidence regarding completely unrelated bad acts that he supposedly performed. However, the Government points out that Eddie opened the door to this evidence by placing his character at issue by calling a character witness.  Before Eddie called the witness, the Government announced its intention to cross-examine the witness about "specific instances that demonstrate that [Eddie] is deceiving others, particularly his wife."  All of this was also set forth in the Government's Rule 404(b) pretrial notice. Eddie's attorney responded "[I]t is all fair game."  Therefore, there is no

---

[1]    We reject as meritless Eddie's arguments about the prosecutor's closing arguments.

error.

*C. Specific Instruction about Cooperating Witnesses*

Eddie argues that the district court erred when it failed to instruct the jury about the caution it should use when considering the testimony of the three cooperating witnesses. Each of these witnesses, he asserts, had much to gain by testifying against Eddie in terms of sentence reductions. He cites the pattern jury instruction that the court did not give but also cites the testimony of each of the witnesses about what they hoped to gain from their testimony.

Eddie did not request the instruction so we review for plain error. "Jury instructions will not be reversed for plain error unless the charge, considered as a whole, is so clearly erroneous as to result in a likelihood of a grave miscarriage of justice, or the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." United States v. Starke, 62 F.3d 1374, 1380–81 (11th Cir. 1995) (internal quotation marks omitted). We accord district courts broad discretion in formulating jury instructions; district courts are not required to use the Eleventh Circuit Pattern Jury Instructions, and this court has repeatedly approved jury instructions that do not exactly track the language of the pattern instructions. United States v. Veltmann, 6 F.3d 1483, 1492 (11th Cir. 1993). Here, there was no error in the district court's failure to give the accomplice instructions. During jury

selection, the court instructed the jury that in deciding whether to believe a witness, it should consider whether the witness had a particular reason not to tell the truth or had a personal interest in the outcome of the case.  The jury was informed at the start of each of the cooperating witnesses' testimony that each had pleaded guilty and hoped to receive favorable sentencing, and each was cross-examined about it. The district court's instructions to the jury substantially covered the issue with respect to the jury's consideration of witness testimony generally (although not specifically highlighting the testimony of accomplices).  Finally, Eddie's attorney highlighted their status in closing and the district court reminded the jury after closing to consider whether any witness had a personal interest in the outcome of the case.  Thus there was no plain error.

## D.  Eddie's Obstruction Enhancement

Eddie argues that the district court erred when it imposed a sentencing enhancement for obstruction of justice that was not accompanied by any specific finding of a statement reflecting willful, material perjury.  The court based the enhancement on Eddie's attempt to portray himself as someone who would have no reason to associate with teenage criminals. Eddie points to cases where we have reversed for district courts' failure to make specific findings, and he argues that just trying to present oneself as a respectable person does not reflect willful

12

perjury. He points to the commentary at U.S.S.G. § 3C1.1, which cautions that not all inaccurate statements or testimony necessarily reflect a willful attempt to obstruct justice.

From the transcript, it is clear that the court accepted the prosecution's extensive argument about all of the lies Eddie told. After the Government finished listing them, the court stated:

> I also agree with the government that this defendant obstructed justice. I could not have been more amazed at the number and the extent of this defendant's lies uttered in his testimony before the jury. I have sat through many trials over 15-plus years, and I have never witnessed a defendant in a criminal case take the stand and lie so blatantly over and over and over again. And not about just tangential matters. But -- and indeed, this defendant and his brother tried to portray themselves as markedly different -- two completely different characters. One, the -- the not-so-sane litigant representing himself, professing to be a Messiah and seeking to overthrow the government. And the other, the well-respected community and family man who would have no reason to associate with these teenage criminals. And some of the testimony that was impeached was uttered by this defendant in direct examination seeking to portray himself in that light to the jury. So it was material, it was not tangential.

Doc. 300 at 22-23. From our review of the transcript, we agree that Eddie's lies were not casual or misstatements; they were calculated to get himself acquitted of the charges and the district court did not err in applying the enhancement.

## II.    MARCUS TALLEY

### A. *Competency*

13

Marcus challenges the district court's finding of fact that he was competent to stand trial. We have carefully studied Marcus's arguments in his brief, the relevant opinions in the court below, and the relevant parts of the record. We cannot conclude that the findings of fact by Judge Jordan in Docket 199 are clearly erroneous. While it is true that Marcus has a considerable history of mental health evaluations, including some past diagnoses of mental illness, this issue was considered with exceeding care in the court below. There were two extensive evaluations, one by Dr. Feldman and another by Dr. Frederick. There were two evidentiary hearings, and two opinions finding that Marcus was competent to stand trial.

Judge Jordan's findings are amply supported by the evaluations and opinions of Drs. Feldman and Frederick. Dr. Feldman, a Bureau of Prisons' forensic psychologist, examined Marcus after his arrest. Because of Marcus's lack of cooperation, only a certain number of tests were administered, but Dr. Feldman did review Marcus's records. Dr. Feldman thought one of the prior tests indicated malingering and thought that it was likely Marcus was feigning incompetence but she could not rule out the possibility that he was suffering from a legitimate mental illness. Dr. Feldman thought that Marcus had the capacity to assist with his defense if he was motivated.

Judge Jordan ordered another evaluation when Marcus requested a de novo

14

review of his competency.  Dr. Frederick, a psychologist at the U.S. Medical Center for Federal Prisoners in Springfield, Missouri, performed the evaluation and delivered a battery of tests.  He determined that Marcus was malingering.  He based part of his diagnosis on the fact that Marcus's symptoms seemed to disappear when he was out of a mental health center.  But he also based his opinion on the battery of tests he administered, his face-to-face meetings with Marcus, and his observations of Marcus over a two-month period.  Dr. Frederick's testing indicated psychosis but the validity factors signaled that Marcus was attempting to give the impression of mental illness.  Judge Jordan also noted that Dr. Frederick's diagnosis would explain some of the earlier statements about the possibility of malingering and the fact that medications had no effect on Marcus.  We thus reject Marcus's challenge.

## B. Self-representation

Marcus also argues that his Sixth Amendment right to counsel was violated when the district court permitted him to proceed pro se at trial with standby counsel.  Judge Altonaga conducted a more than adequate Faretta hearing.  The district judge had before her the aforesaid evaluations by Drs. Feldman and Frederick.  She had before her the record of the proceedings with respect to competency, which had occurred before the case was assigned to her, and thus she

15

knew that both the Magistrate Judge and Judge Jordan had conducted evidentiary hearings and found that Marcus was competent to stand trial and was malingering. With respect to Marcus's reliance upon Indiana v. Edwards, 554 U.S. 164, 128 S. Ct. 2379 (2008), we can assume arguendo, but need not decide, that a higher standard might govern the issue of competency to waive counsel and proceed pro se at trial in this case, as opposed to that articulated in Dusky v. United States, 362 U.S. 402, 80 S. Ct. 788 (1960). We need not articulate any precise standard for this case because the record amply supports the district court's conclusion under any reasonable standard that Marcus was competent to waive counsel and to proceed pro se as he did.  This is true especially in light of the fact that Marcus did not preserve this issue below, and therefore our review is pursuant to the plain error analysis.

Judge Altonaga had two psychiatric reports before her indicating that Marcus was capable of understanding the charges against him and could assist counsel if he wanted to, but was malingering.  These reports also informed the Judge that Marcus talked about his case rationally and coherently with family or others when he was not aware that he was being evaluated with respect to mental health issues.  The findings of competence to stand trial by the Magistrate Judge, and the even more recent finding of competence by Judge Jordan, were very current.  Moreover, the actions of Marcus, upon which he now relies in arguing

16

that Judge Altonaga should have been alerted to order still more psychiatric evaluations, are actions identical to those so carefully considered by the Magistrate Judge and Judge Jordan, and found to be malingering. Not only did Judge Altonaga provide the warnings and elicit the understandings indicated in <u>Faretta</u>, but she secured assurances that Marcus would use his stand-by counsel appropriately. We cannot conclude that the district court erred in permitting Marcus to proceed pro se with stand-by counsel.[2]

## C. Failure to Grant a Continuance

Marcus argues that the district court erred in failing to order a continuance. However, he does not dispute the Gorvernment's contention that Marcus did not himself request a continuance at the hearing during which the <u>Faretta</u> colloquy occurred, which was after his attorney withdrew the previously filed motion for continuance. Nor does Marcus dispute the Gorvernment's contention that he did not ask for a continuance immediately before trial, during the discussion about his not having civilian clothing. We cannot conclude that the district court abused its discretion in failing to sua sponte grant a continuance.

---

[2] Marcus's argument that the district court should have appointed a new and different stand-by counsel is without merit. The record is clear that his only dissatisfaction with his existing appointed counsel was counsel's disagreement with the unwise defense strategy upon which Marcus was insisting.

17

*D. Juror No. 4*

Marcus argues for the first time on appeal that the district court erred in refusing to discharge juror No. 4 for cause. The juror had expressed discomfort because she lived in the same area as the Defendants. However, questioning of the juror elicited her statement that she could fulfill her oath as a juror and try the case fairly to both sides. After the prosecutor and Eddie's attorney indicated that the juror need not be stricken for cause, the judge asked Marcus, who replied "I am all right." We thus cannot conclude that the district court abused its discretion.

*E. Expert witnesses*

Marcus argues that the district court erred when it summarily denied his request to subpoena witnesses to support his mens rea defense and his explanation of his urban guerrilla evidence. He asserts that it denied the request without permitting a proffer of the evidence that would have been obtained and without permitting him to make the application in an ex parte fashion.

The Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense." Holmes v. South Carolina, 547 U.S. 319, 324, 126 S. Ct. 1727, 1731 (2006). Here, Marcus was able to introduce documents relevant to the testimony regarding his ideology, cross-examine cooperating witnesses about the ideology, and argue the substance of his opinions to the jury. The court

18

offered Marcus the opportunity to enter into evidence documents written by the witnesses he sought to subpoena.  Initially, the court ruled that Marcus's Ninth Amendment reservation of rights was not a legal defense to the charges so the items would not be admitted.  After the Government introduced Marcus's comments to Detective Lanier, the court reconsidered and allowed Marcus to enter sections of the Federalist Papers and other treatises regarding Marcus's perception of the Government's relationship to banks and to money.  Marcus presented a composite exhibit (with assistance of standby counsel), of which the court allowed portions into evidence.  Thus, Marcus was not denied the opportunity to present his defense.[3]

Having rejected all challenges to the convictions and sentences,[4] we AFFIRM.

---

[3] We reject Marcus's argument that the Government failed to prove that Bank of America was FDIC-insured as wholly without merit.

[4] Any arguments of Defendants not expressly mentioned are rejected without need for discussion.

19